688 F.2d 1193
 Merrill KARLEN, Appellee,
v.
RAY E. FRIEDMAN & COMPANY COMMODITIES, Appellant.
Rosemary KARLEN, Trustee for the Karlen Boys' Trust and
Karlen Girls' Trust, Appellee,
v.
RAY E. FRIEDMAN & COMPANY COMMODITIES, Appellant.
Merrill KARLEN, Appellant,
v.
RAY E. FRIEDMAN & COMPANY COMMODITIES, Appellee.
 Nos. 81-1373, 81-1375 and 81-1422.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 15, 1981.
Decided Sept. 15, 1982.
 
 Wally Eklund, Johnson, Johnson & Eklund, Gregory, S.D., for appellees/cross appellants.
 Jack J. Esses, Marcus, Esses & Associates, Ltd., Chicago, Ill., for appellant/cross appellee.
 Before HEANEY and STEPHENSON,* Circuit Judges, and DAVIES,** Senior District Judge.
 HEANEY, Circuit Judge.
 
 
 1
 This matter arises from a series of commodities transactions in 1974 and 1975. Ray E. Friedman & Company Commodities appeals from the district court's[1] order entering judgment on the jury verdicts for Rosemary Karlen on her unauthorized trading action and for Merrill Karlen on his unauthorized trading and churning claims. Merrill Karlen cross-appeals from the district court order granting defendant's motion for judgment notwithstanding the verdict (j.n.o.v.) on his negligence claim. We affirm the district court's decision.
 
 
 2
 Plaintiffs Merrill and Rosemary Karlen own and operate a cattle ranch near Reliance, South Dakota. Defendant Ray E. Friedman & Company Commodities (Friedman) is a Chicago brokerage firm with several branch offices, including one in Sioux Falls, South Dakota. Friedman is a member of the Chicago Mercantile Exchange, one of the nation's major commodity exchanges. From March, 1971, through November, 1975, the defendant employed Donald Margulies as an account executive[2] and manager of the Sioux Falls branch. Margulies was a registered representative with the Chicago Mercantile Exchange and was approved by it to manage Friedman's Sioux Falls branch.
 
 
 3
 In May, 1974, the plaintiffs opened two accounts with the defendant through Margulies. One account was for Merrill Karlen individually; the other was for Rosemary Karlen, as trustee for two trusts that the plaintiffs had established for their children. Merrill Karlen had authority to, and did in fact, deposit money and execute trades for both accounts. Rosemary Karlen did not direct any trades. Both accounts were non-discretionary accounts; thus, Margulies was required to obtain Merrill Karlen's approval prior to executing trades. Karlen initially deposited $72,000 in his individual account between May 22, 1974, and July 16, 1974. He deposited $10,000 in the trust account on July 23, 1974. Thereafter, he made various additional deposits to the accounts which totaled $155,050. The plaintiffs ultimately invested $237,050 with Friedman.
 
 
 4
 Sometime after June 24, 1974, Karlen began to complain to Margulies that he was engaging in unauthorized trading with the two accounts. The plaintiff also complained that he could not understand whether he was making or losing money, even though he was receiving trade confirmation slips and monthly activity statements from Friedman. Karlen, however, did not immediately close the accounts or directly contact officials for the defendant. At trial, Karlen explained that he failed to take these actions because Margulies "would talk me out of it. Everything is hunky-dory. He was going to work it out."
 
 
 5
 In August, 1975, the plaintiffs closed their accounts. Friedman returned $11,965.77 to Merrill Karlen from the $82,650 he had deposited in his account. Rosemary Karlen received $2,525.50 out of the $115,000 she had deposited. Thereafter, another Friedman account executive informed Karlen that the defendant had dismissed Margulies because he had failed a National Association of Securities Dealers' proficiency exam.
 
 
 6
 The plaintiffs then commenced separate lawsuits against Friedman. Rosemary Karlen alleged that all trades Margulies executed for her account after July 24, 1974, were unauthorized. Merrill Karlen alleged that Margulies (1) traded without authorization for all transactions in his individual account after July 24, 1974, (2) excessively traded or "churned" his account, and (3) negligently handled his account after January 1, 1975. The claims of both plaintiffs were based on South Dakota common law. Their separate actions were consolidated for trial.
 
 
 7
 The jury found in favor of the plaintiffs on all counts. The district court entered judgment in favor of both plaintiffs on their unauthorized trading claims, and in favor of Merrill Karlen on his churning claim. It, however, entered a j.n.o.v. on Merrill Karlen's negligence claim. Friedman appeals from the judgments entered against it. Merrill Karlen cross-appeals from the district court's j.n.o.v. on his negligence claim.
 
 I.
 UNAUTHORIZED TRADING
 
 8
 The jury found the defendant liable for unauthorized trading of both accounts, and awarded $92,474.50 to Rosemary Karlen and $25,000 to Merrill Karlen.[3] The district court denied the defendant's motion for j.n.o.v., or alternatively for a new trial, on these claims. The defendant contends that this denial constitutes reversible error on three major grounds. First, the trades in question were authorized by the plaintiffs. Second, even if the trades were not authorized prior to execution, the plaintiffs subsequently ratified them, or they waived or are estopped from asserting their claim that they did not authorize the trades. Third, the damages awarded by the jury were improper.
 
 
 9
 An appellate court, as well as a trial court, may set aside a jury verdict only when there is no evidence of substance upon which reasonable persons could differ. E.g., McCamley v. Schockey, 636 F.2d 256, 258 (8th Cir. 1981). In reviewing the district court's denial of defendant's motion for j.n.o.v. or a new trial, we are not free to weigh the evidence, to pass on the credibility of witnesses, or to substitute our judgment for that of the jury. E.g., Farner v. Paccar, Inc., 562 F.2d 518, 522 (8th Cir. 1977). Instead, we must view the evidence in the light most favorable to the plaintiffs and give them the benefit of all reasonable inferences to be drawn from the record. Id. With these standards of review in mind, we turn to Friedman's contentions.
 
 
 10
 A. Authorization.
 
 
 11
 The defendant first argues that the evidence establishes, as a matter of law, that Merrill Karlen authorized all of the trades in question. There is no merit to this claim. Margulies testified that he obtained authorization for the trades that he made. The plaintiffs testified that no trades after July 24, 1974, were authorized. This issue is simply a factual dispute which depends on the witnesses' credibility. We have no basis on this record for holding that, as a matter of law, the jury could not reasonably find that the trades were unauthorized.
 
 
 12
 B. Ratification, Waiver and Estoppel.
 
 
 13
 The defendant next contends that even if the trades were unauthorized, the plaintiffs' actions are barred by the doctrines of ratification, waiver and estoppel. Although these doctrines are distinct,[4] the defendant-by relying on the same underlying facts-has essentially treated them as one defense. Its theory is, in essence, that the Karlens' claims must fail as a matter of law because even if the plaintiffs did not authorize the trades, they knowingly and voluntarily assented to them after they occurred. Friedman bases its defense primarily on (1) Merrill Karlen's (hereafter Karlen) testimony that when he called Margulies to object to unauthorized trades, Margulies would convince him that everything was in order; (2) Karlen's admission that the plaintiffs received confirmation slips from the defendant for all trades and monthly activity statements; and (3) the fact that the plaintiffs continued to invest substantial funds into their accounts even though Margulies allegedly was disobeying their directions, and they were suffering significant losses.[5]
 
 
 14
 We reject the defendant's arguments. The question is not simply whether Karlen assented to the trades; rather it is whether his apparent assent was given voluntarily and intelligently with full knowledge of the facts. This question, as a factual issue, was properly submitted to the jury, and there was sufficient evidence in the record to support its finding in favor of the plaintiffs.
 
 
 15
 Several factors support the jury's finding that the plaintiffs did not knowledgeably and voluntarily consent to the trades. First, we must consider the factual setting in which this controversy arose. Commodities futures trading is an arcane and complicated field in which specialized knowledge is generally required to participate intelligently and successfully. See, e.g., Everyone Encounters Commodities Regulation Sooner or Later * * *, 35 Bus. Law. 1 et seq. (1980); Regulation of Commodities Futures Trading, 27 Emory L.J. 847 et seq. (1979). The plaintiffs lacked sophistication and experience as commodities futures traders. Merrill Karlen has spent his adult life as a rancher, not an investor. He entered the commodities market on only one occasion prior to engaging Margulies' services. In that instance, he directed a local broker to execute one purchase and one sale of some contracts for either "feeder" or "fat" cattle. Karlen lost.$19,000. Rosemary Karlen had no experience at all with commodities. In contrast, Friedman is a clearing member with the Chicago Mercantile Exchange,[6] and has substantial experience in commodities futures trading. Karlen testified that Margulies told him in their initial conversations that
 
 
 16
 Ray Friedman had an advisory service that was right in touch with the market and could assist me in advisory service, knew what to trade in, because they was well experienced in that, * * * (Margulies) assured me he had advisory service and was in constant touch with the market and knew just what was going on.
 
 
 17
 Moreover, Friedman, by placing Margulies as the manager of its Sioux Falls branch office, held him out as being a qualified and competent commodities trader. Margulies was, in fact, a registered representative on the exchange. Additionally, Margulies was highly recommended to Karlen by a personal acquaintance for whom Margulies had been successfully trading. The jury certainly was entitled to infer from these circumstances that Karlen was relying on the expertise of the defendant and its representative. Indeed, Karlen testified that "I never had the time to watch these things closely and they were the type of people I needed."
 
 
 18
 It is also significant that Karlen did not readily approve of the transactions upon learning of them. He testified that
 
 
 19
 I called (Margulies), visited with him about (the trades in controversy) and he convinced me that everything is working out and being properly done and it was all in the plan that he and Friedman had come up with to work their way out of it, make up the loss they lost.
 
 
 20
 Q. Did he tell you what the loss was?
 
 
 21
 A. No. Never did tell me exactly what the loss was, just that we was behind on some of them, might seem to me we was holding some contracts that was on the down side or the other way and I asked him why I was hanging on to it for so long and he convinced me it was all part of their plan.
 
 
 22
 * * * He convinced me I was making money and there was nothing wrong and it was all planned, following advice of Friedman and Company, the head office * * * (.)
 
 
 23
 Indeed, Karlen alleged that he telephoned Margulies at least fifteen to twenty times after July 24, 1974, to object to the broker's actions. In addition, in a letter dated December 22, 1974, Karlen wrote to Margulies to again object to unauthorized trades and to forbid any future trading without prior authorization.
 
 
 24
 Moreover, the foregoing evidence must be considered in light of Karlen's further testimony that he failed to understand the confirmation memoranda and monthly activity statements sent to him by Friedman. Karlen testified that he was confused because he could not determine from the documents whether he was making a profit or loss, and because the monthly statements did not include all trades for which he had received confirmation slips during that month. He stated:
 
 
 25
 A. Well, everyone of (the monthly activity statements) confused me. I think I called him on every one of them when I got one.
 
 
 26
 * * * One thing that confused me was those, because there was so much trading going on, because sometimes it would be a sale and purchase and in the meantime before, I was just lost where I was at.
 
 
 27
 Q. (After you talked to Margulies) did you understand (the monthly activity statements)?A. I don't know if I ever did understand it because there was activity going on, which weren't reflected on those sheets, that's what confused me. He got me feeling I was plumb stupid on them sometimes.
 
 
 28
 Regarding his lack of understanding of the confirmation slips, Karlen testified:
 
 
 29
 I didn't understand how I stood on an account so I would visit with him on that and usually he would convince me everything was alright (sic) and then I would get another one and I would get just as confused as I was before.
 
 
 30
 Karlen's inability to determine the current status of the accounts from the documents sent by Friedman is understandable. Margulies executed a large number of trades in a short period of time, and Karlen had little experience in commodities to assist him in understanding the transactions. See supra, at 1198-1199. Moreover, the plaintiffs were inundated with a large volume of documents of various types that had differing purposes which Friedman did not describe.[7] Indeed, the documents used technical terms that did not plainly or precisely explain to an inexperienced or unsophisticated trader the information that they were providing. In fact, because the year-end and monthly activity statements sent by Friedman reported only closed transactions, they could convey seriously inaccurate impressions concerning the status of the accounts. For example, as the defendant concedes, the year-end statement for 1974 actually showed a $1,000 profit, even though Karlen lost thousands of dollars that year when all outstanding contracts were finally closed.
 
 
 31
 It has been recognized that confirmation slips and monthly statements do not enable a customer to determine his or her overall position or the total amount of real profit or loss occurring, unless the customer is sufficiently skilled to elaborate upon them to make that determination. Hecht v. Harris, Upham & Co., 283 F.Supp. 417, 434 (N.D. Cal. 1968), modified on other grounds, 430 F.2d 1202 (9th Cir. 1970); Newkirk v. Hayden, Stone & Co., Fed. Sec. L. Rep. (CCH) P 91,621 at 95,319, 95,320 (S.D. Cal. 1965). When a customer lacks the skill or experience to interpret confirmation slips, monthly statements or other such documents, courts have generally refused to find that they relieve a broker of liability for its misconduct. See, e.g., Hecht v. Harris, Upham & Co., supra, 283 F.Supp. at 434-439; Newkirk v. Hayden, Stone & Co., supra, Fed. Sec. L. Rep. (CCH) at 95,320-95,321.
 
 
 32
 Despite the foregoing evidence, the defendant makes much of plaintiffs' continuing deposits into the accounts during the period in controversy. Karlen's testimony that he did not know whether he was in a profit or loss position due to Margulies' representations and his own inability to decipher Friedman's documents partially explains the continuing investments in the accounts. Moreover, Karlen also testified that he only deposited money when he received a margin call from Friedman. In this regard, he explained:Q. And despite the fact that he was disobeying your orders, according to your testimony, and even though you didn't call Friedman about it or write Friedman or report it in any manner to Friedman, you continued to put money into the accounts, didn't you?
 
 
 33
 A. Well, like I say, when I got a margin call, Don wanted to make sure he got ahold of me. It was my understanding if I didn't put the money in I was in violation of government rules.
 
 
 34
 Q. Mr. Karlen, was it your understanding at the time you had these accounts if you didn't meet a margin call you would be violating a federal rule?
 
 
 35
 A. That's right.
 
 
 36
 Q. As opposed to losing the account?
 
 
 37
 A. Violating a federal rule is my understanding. I'm sure that's what Mr. Margulies told me.
 
 
 38
 Q. You felt you had to put the money in or you would be in violation of law?
 
 
 39
 A. That is right.
 
 
 40
 Q. Where did you get that information?
 
 
 41
 A. I think Mr. Margulies told me that.
 
 
 42
 Thus, the record here contains substantial evidence supporting the jury's verdict in favor of the plaintiffs on their unauthorized trading claims. There also is, as the defendant contends, evidence in the record that supports its affirmative defenses. It is not, however, our function to weigh conflicting evidence or to pass on the credibility of witnesses; those duties were for the jury. Accordingly, viewing the evidence in the record as a whole in the light most favorable to the plaintiffs, we cannot say that no reasonable person could infer from the record here that any assent manifested by Merrill Karlen to the trades after June 24, 1974, was not voluntarily and intelligently made with full knowledge of the facts. See Hackett v. Reynolds & Co., 577 F.2d 948, 950 (5th Cir. 1978) (customers did not ratify transactions as a matter of law where broker's representative successfully "brush(ed) aside" their objections); McCurnin v. Kohlmeyer & Co., 347 F.Supp. 573, 578 (D. La. 1972), aff'd, 477 F.2d 113 (5th Cir. 1973) (customer did not ratify transactions where broker's representative misinformed him that unauthorized trades could not be rescinded and created false hope that trades would be profitable). The jury, therefore, did not err as a matter of law in rejecting defendant's ratification, waiver and estoppel defenses.
 
 
 43
 C. Damages.
 
 
 44
 The defendant's final challenge to the judgment against it relates to the damage award. The jury, applying the out-of-pocket loss theory contained in the district court's damage instruction, awarded Rosemary Karlen $92,474.50 for her unauthorized trading claim. This amount represents her $105,000 total deposit less the initial $10,000 deposit, which the district court found as a matter of law that Karlen had authorized Margulies to trade,[8] less the $2,525.50 returned to the plaintiff when she closed her account.
 
 
 45
 Friedman did not argue at trial that the district court's out-of-pocket loss instruction contained an improper damage formula.[9] In its motion for j.n.o.v. and on appeal, however, the defendant contends that this damage instruction and the jury award based on it are improper as a matter of law because it does not take account the "impact of the trading of the initial deposit (which was authorized by Karlen) on future transactions and the condition of the account as it existed thereafter."
 
 
 46
 The defendant's failure to challenge the substance of the damages instruction before it was submitted to the jury prohibits it from thereafter raising that objection. Fed. R. Civ. P. 51; Arkla Exploration Co. v. Boren, 411 F.2d 879, 883-884 (8th Cir. 1969). Moreover, even if Friedman is correct that the district court's instruction did not precisely account for authorized trading on the initial deposit-a proposition with which we do not necessarily concur-we do not agree that the damage award was improper. Courts and regulatory agencies in securities and commodities fraud cases, while recognizing that the out-of-pocket loss theory might not permit damages to be calculated completely accurately, have frequently utilized such a formula because it is a satisfactory device for awarding rough compensation when relief is warranted. See, e.g., Myron v. Hauser, 673 F.2d 994, 996 & n. 3 (8th Cir. 1982); Sharp v. Coopers & Lybrand, 83 F.R.D. 343, 347-348 (E.D. Pa. 1979); Note, Churning by Securities Dealers, 80 Harv. L. Rev. 869, 883-885 (1967); Frankhauser and Selig, Private Actions Under the Commodity Exchange Act: Implying Less and Enjoying it More, 35 Bus. Law. 847, 859 (1980). The damage award in favor of Rosemary Karlen, therefore, was not improper.
 
 
 47
 The district court also instructed the jury that it could award Merrill Karlen damages for unauthorized trading in the amount of funds he deposited "up until January 1, 1975, to the extent that you find such monies were traded without authorization between July 24, 1974 and July 1, 1975, minus the amount of such monies ultimately returned to Karlen." The jury awarded Karlen $25,000. The defendant claims that the jury erred in awarding this amount.
 
 
 48
 The defendant objects, in part, to this damage award for the same reason that he challenges the award to Rosemary Karlen; that is, the district court's out-of-pocket loss theory supposedly does not account for authorized trades made on certain deposits. We again reject this claim for the reasons stated with respect to the damages award to Rosemary Karlen.
 
 
 49
 The defendant also claims that the $25,000 award is improper because it is speculative. While this issue too is a close one, we cannot agree with the defendant. Initially, it is apparent, as the district court noted, that the jury might have awarded Karlen more for his unauthorized trading claim. Under the jury instructions and the record evidence, Karlen could have received $38,034.23 ($50,000 in deposits between July 24, 1974, and January 1, 1975, less $11,965.77 returned when the account was closed). Such an award would have been consistent with the out-of-pocket loss theory and the damages received by Rosemary Karlen. The jury, however, awarded less. Nonetheless, we cannot say its damage award was speculative.
 
 
 50
 The plaintiff has elected not to challenge this verdict. Thus, he is bound by his election. Friedman should not be heard to complain that the damage award against him should be vacated because it might properly have been larger. Moreover, it is important to consider that the district court explicitly admonished the jury not to duplicate awards or give double compensation if it found in favor of Karlen on more than one of his three counts. In fact, the jury found Friedman liable on all three counts and awarded Karlen $25,000, $21,000 and $6,575 for his unauthorized trading, negligence and churning actions, respectively. In view of the complicated nature of the transactions involved here, evidenced by a plethora of documents, and the district court's strict instructions not to afford Karlen duplicate relief, the jury was entitled to some latitude in determining the proper amount of damages for Karlen's unauthorized trading claim.
 
 
 51
 Furthermore, we emphasize again that courts and regulatory agencies have regularly employed the out-of-pocket loss theory in securities and commodities fraud cases. See supra, at 1201. Although they have recognized that the formula provides approximate, rather than exact, compensation, they have also recognized that wrongful conduct, when established, should not go unpunished. Id. It is a familiar principle that one whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered is not entitled to complain of the difficulty of exact computation. See, e.g., Hecht v. Harris, Upham & Co., supra, 283 F.Supp. at 440. Therefore, the damage award for Merrill Karlen's unauthorized trading claim is also affirmed.
 
 II.
 CHURNING
 
 52
 The jury also awarded Merrill Karlen $6,575 on his claim that the defendant "churned" his account. The district court instructed the jury that:
 
 
 53
 "Churning" occurs when a broker, directing the volume and frequency of trades, abuses his customer's confidence for personal gain by initiating transactions that are excessive in view of the character of the account and the customer's objectives as expressed to the broker. Churning cannot occur as to any trade directed by the customer.
 
 
 54
 The defendant does not contend that this instruction is an improper statement of the law. It does argue, however, that the evidence was insufficient to submit the question to the jury.[10] We cannot agree.
 
 
 55
 There is no precise rule or formula for determining when churning has occurred. Booth v. Peavey Co. Commodity Services, 430 F.2d 132, 134 (8th Cir. 1970). The essence of the fraud is that the frequency of the trades is unjustified by the particular circumstances of the case. Gleit v. Shearson, Hammill & Co., Inc., Fed. Sec. L. Rep. (CCH), P 95,799 at 90,886, 90,889 (S.D.N.Y. 1976).
 
 
 56
 The essential elements of a churning action are control of the account by the defendant and excessive trading. See Booth v. Peavey Co. Commodity Service, supra, 430 F.2d at 134; Shorrock v. Merrill Lynch, Fed. Sec. L. Rep. (CCH) P 96-251 at 92,673, 92,675 (D. Ore. 1977). To establish unlawful churning, the plaintiff need not show that he vested in the broker or its representative formal discretion over the account; effective control is sufficient-particularly when the customer is relatively inexperienced and unsophisticated in commodities trading. See Landry v. Hemphill, Noyes & Co., 473 F.2d 365, 373-374 (1st Cir.), cert. denied, 414 U.S. 1002 (1973); Hecht v. Harris, Upham & Co., supra, 283 F.Supp. at 433.
 
 
 57
 Margulies clearly exercised sufficient control over Karlen's account to establish a churning claim; in fact, his control was nearly total as evidenced by several facts. Karlen followed most, if not all, of Margulies' recommendations, including his advice to keep the account open after Margulies had executed unauthorized trades. Moreover, Karlen lacked experience in securities matters. Finally, Karlen had difficulty understanding the transactions in question-even after Margulies tried to explain them. Supra, at 1199-1200. See Landry v. Hemphill, Noyes & Co., supra, 473 F.2d at 373-374; Shorrock v. Merrill Lynch, supra, Fed. Sec. L. Rep. (CCH) P 96-251 at 92,676; Note, Churning by Securities Dealers, supra, 80 Harv. L. Rev. at 871-874.
 
 
 58
 The record also contains sufficient evidence of excessive trading to raise a question for the jury. A pattern of in-and-out trading[11] is a key indicator of excessive trading by the broker or its representative. See Hecht v. Harris, Upham & Co., supra, 283 F.Supp. at 435-436; Note, Churning by Securities Dealers, supra, 80 Harv. L. Rev. at 876. The plaintiff introduced evidence showing that Margulies had engaged in such activity. Plaintiffs' expert, Dr. Gene Murra, an agricultural economics professor at South Dakota State University, testified at trial that "(t)here was a lot of in and out trading that didn't seem to be following a pattern * * *." He also stated that Margulies' transactions were contrary to certain generally accepted commodities trading principles. See infra, at note 14. There is also record evidence showing that in several of the instances where trades produced profits, the broker's commissions exceeded the profits. These actions support the inference that Margulies' predominant purpose in trading was to advance his own interests rather than to produce profits for his customer.
 
 
 59
 Moreover, in summing up his examination and analysis of the circumstances here, Dr. Murra testified that it was "strongly probable" that "churning" occurred in view of the amount of commissions,[12] the number of trades,[13] the pattern of trading,[14] and the instances where Margulies had entered trades on opposite sides of the same contract.[15] Cf. Booth v. Peavey Co. Commodity Services, supra, 430 F.2d at 135 (plaintiff failed to introduce sufficient evidence to create jury question on churning charge where no objective criteria and no expert testimony were presented to enable the jury to determine whether trading was excessive).
 
 
 60
 Finally, evidence showing that the broker or its representative executed transactions inconsistent with the customer's needs or objectives is relevant to a churning charge. Id. at 134. Here, Karlen's continuing complaints to Margulies indicate that Margulies was engaging in trading that was contrary to plaintiff's objectives. Id.
 
 
 61
 The foregoing evidence supports the jury's finding that the defendant, through its agent Margulies, engaged in unlawful churning. Friedman, nonetheless, advances three reasons which it contends establishes, as a matter of law, that it did not churn Karlen's account. We find them unpersuasive.
 
 
 62
 First, the defendant contends no churning occurred because some of the trades were profitable. The fact remains undisputed, however, that Karlen suffered a large net loss as a result of his trading with Friedman. Moreover, the mere fact that in the course of an account profits are made from time to time-or even the fact that a net overall profit is made-is not a sufficient defense to a churning charge. Hecht v. Harris, Upham & Co., supra, 283 F.Supp. at 435; Note, Churning by Securities Dealers, supra, 80 Harv. L. Rev. at 878.
 
 
 63
 Second, the defendant claims that the damage award of $6,575 for churning duplicates the awards for Karlen's unauthorized trading and negligence claims because it equals the total of all commissions charged from January 1, 1975, until the account was closed. This argument ignores the fact that the total damages received by Karlen are less than his out-of-pocket loss. Accordingly, we cannot say, as a matter of law, that the jury's churning award duplicates the damages awarded to Karlen on the unauthorized trading count.
 
 
 64
 Third, the defendant relies on the testimony of its vice president, Raymond Lacey, that the commissions generated in the two months of concededly authorized trading exceeded the average commissions charged for any two-month period thereafter. This fact, if correct, may or may not tend to refute a charge of churning. But in any event, it at most raises a factual issue for the jury to resolve after considering Lacey's testimony along with that introduced by plaintiffs.
 
 
 65
 Friedman has failed to establish that no reasonable jury could have found that it churned Karlen's account. Accordingly, we affirm the district court's order entering judgment on the jury's verdict for Karlen on his churning claim.
 
 III.
 NEGLIGENCE
 
 66
 The jury awarded Karlen $21,000 for his claim that Margulies negligently handled his account after January 1, 1975. The district court, however, granted the defendant's motion for j.n.o.v. on this issue because it concluded that the jury's award was purely speculative in light of the evidence. We agree.
 
 
 67
 In arguing that the district court erred in entering j.n.o.v. on the negligence count, Karlen contends that the defendant owes him a fiduciary duty and reiterates his claims that Margulies executed unauthorized trades, misrepresented the status of his account, and traded contrary to certain generally accepted commodities principles. To the extent that this negligence action is based on Margulies' trades without authorization, Karlen already has been compensated.
 
 
 68
 To the extent that Karlen's negligence theory envisions some other misconduct, we agree with the district court that Karlen simply has failed to establish what damage was caused by the defendant's acts or omissions. The district court reasoned:
 
 
 69
 Although I assume without deciding that the jury could find defendant negligent, there was no basis in the record for concluding that, but for such negligence, the loss would not have occurred. A determination of the loss proximately caused by negligent trading necessarily required some showing, however slight, of how the account would have fared on the market if traded non-negligently. Any other approach would totally ignore the risk of loss which, beyond dispute, inheres in speculating on the commodities futures market. Karlen utterly failed to produce any evidence of how a properly managed account would have fared on the market during that period, and his counsel did not propose to the court nor argue to the jury any way of estimating or inferring the proper figure.
 
 
 70
 On appeal, Karlen again has failed to point to record evidence that shows how a reasonably prudent broker would have handled his account. Nor do we find any evidence in the record that would have enabled the jury to determine the profit or loss Karlen would have realized if defendant's agent had not traded negligently. Accordingly, we agree with the district court that the jury's award for negligence was purely speculative and, thus, the j.n.o.v. was properly granted.
 
 
 71
 For the foregoing reasons, the judgment and order of the district court are affirmed.
 
 
 
 *
 The Honorable ROY L. STEPHENSON assumed senior status on April 1, 1982
 
 
 **
 The Honorable RONALD N. DAVIES, United States Senior District Judge for the District of North Dakota, sitting by designation
 
 
 [1]
 The Honorable Donald J. Porter, United States District Judge, District of South Dakota
 
 
 [2]
 The account executive is the contact point for a brokerage firm's customers. His or her duties include accepting and transmitting orders, informing customers of new developments in the markets, answering customers' questions and helping customers formulate their trading objectives. Hieronymous, Economics of Futures Trading (1971), at 56
 
 
 [3]
 The district court submitted the plaintiffs' unauthorized trading claims to the jury on a conversion theory. The defendant contends that the district court erred in utilizing a conversion instruction for Rosemary Karlen's claim because her complaint alleged only a cause of action for money had and received, and she did not move to amend her theory of liability. The defendant further argues that the claim for money had and received must fail as a matter of law because Friedman does not hold any of the money deposited by Rosemary Karlen-which the defendant alleges is a prerequisite to the action-since it either traded the funds or returned them to her. The defendant's position is untenable. Rule 15(b) of the Federal Rules of Civil Procedure permits any theory of liability to be considered that is tried and argued by the parties, regardless of whether or not it is included in the pleadings. E.g., Wansor v. George Hantscho Co., 570 F.2d 1202, 1208 (5th Cir.), cert. denied, 439 U.S. 953, 99 S.Ct. 350, 58 L.Ed.2d 344 (1978); Wright & Miller, 6 Federal Practice and Procedure (1971), at §§ 1491, 1493. Indeed, Rule 15(b) explicitly states that the absence of a formal amendment or request for leave to amend "does not effect the results of the trial" of those issues actually litigated
 
 
 [4]
 The district court instructed the jury as follows:
 Ratification:
 If you find that plaintiff, with full knowledge of the facts, manifested in some way that he was electing to treat the allegedly unauthorized transactions as authorized, or that his conduct would be justifiable only if there was such an election, then you may find that plaintiff "ratified" the transaction, and may find for defendant.
 Waiver:
 Therefore, if you find by a preponderance of all the evidence that plaintiff, with knowledge of unauthorized transactions and of the right to object thereto, voluntarily and intentionally failed to make proper objection within a reasonable time, then you may find that plaintiff waived his right now to object, and may find for defendant.
 Estoppel:
 Therefore, if you find * * * plaintiff by his conduct intentionally or through culpable neglect, led defendant to believe that trading was proceeding as agreed, and that defendant, in reasonable reliance on that belief, continued to trade so that it would prejudice defendant if plaintiff now is permitted to deny that the trading was authorized, then you may find that plaintiff is estopped from denying that the trading was authorized, and may find for defendant.
 Friedman does not contend that any of these instructions misstate the applicable law.
 
 
 [5]
 The defendant also argues that it cannot be liable for any misconduct by its agent Margulies because the plaintiffs knew, or should have known, that Margulies was acting for his own benefit and adversely to Friedman's interests. The defendant contends that because it was sending the plaintiffs confirmation slips and monthly activity statements showing that trades were being executed even though they had not authorized such transactions, the Karlens necessarily knew, or should have known, Margulies was exposing Friedman to liability for unauthorized trading
 The defendant's claims are meritless. The district court did not err by finding that the plaintiffs neither knew nor should have known that Margulies was acting beyond his authority. Margulies represented to Karlen that his trading was in accordance with Friedman's trading strategy. Infra, at 1199. Moreover, Friedman plainly held Margulies out as its agent. It placed Margulies in his position as manager of its Sioux Falls branch office. Furthermore, Margulies-obviously with defendant's consent-set up the Karlens' accounts, executed their trades through the exchange, provided them with information about markets, contacted them regarding Friedman's margin calls and requests for updated information, and kept the records concerning their accounts. It is clear then that an agency relationship existed between Friedman and Margulies, and that the activity in issue here was within the scope of Margulies' employment. The plaintiffs had no reason to know that Margulies was acting beyond the scope of his authority. Accordingly, Friedman is bound by the acts and omissions of its agent. See, e.g., Master Commodities, Inc. v. Texas Cattle Management Co., 586 F.2d 1352, 1357-1361 (10th Cir. 1978); Lewis v. Walston & Co., Inc., 487 F.2d 617, 623-624 (5th Cir. 1973); Markham & Meltzer, Secondary Liability Under the Commodity Exchange Act-Respondeat Superior, Aiding and Abetting, Supervision and Scienter, 27 Emory L.J. 1115, 1118-1134 (1978).
 
 
 [6]
 A clearing member is a person or firm that is a member of the clearing organization of an exchange. The clearing organization matches all buys and sells executed each day and assures the financial integrity of all futures transactions by assuming the opposite side of every trade made on the exchange. See Hieronymous, Economics of Futures Trading, supra, at 40-43; Smith, Commodity Futures Trading, 25 Drake L. Rev. 1, 57-59 (1975)
 
 
 [7]
 Friedman confirmed each trade by mailing the plaintiffs, on the morning after the trade, a written confirmation slip describing the type, price and quantity of the commodity traded. In addition, each month Friedman mailed to the plaintiffs an activity statement which reported trades executed during the preceding month, the net profit or loss on transactions that were closed that month, and an account balance reflecting the closed transactions. Each monthly activity statement was accompanied by a document entitled "Statement of Account-Open Trades." These documents reported under the column title "open trade equity," the profit or loss that would have been recognized on all open contracts if they had been closed on the final day included in the monthly statements. The phrase "open trade equity" was not defined or explained in the "Statement of Account-Open Trades" document. Finally, Friedman, from time to time, mailed documents entitled "Statement of Account-Purchase and Sale." Although the purpose of these forms was not described in the record, they were apparently sent when the plaintiffs either deposited funds or closed out their position in any futures contract
 All of the documents mailed by the defendant included the name, address and telephone number of Friedman, and contained the legend: "NOTE: PLEASE REPORT ANY DIFFERENCES IMMEDIATELY."
 
 
 [8]
 Rosemary Karlen does not challenge this finding
 
 
 [9]
 Friedman, however, did argue that there was insufficient evidence of unauthorized trading to support a damage award under any formula
 
 
 [10]
 Friedman contends that the district court also erred by permitting Karlen to amend his complaint to include the churning count after all the evidence was presented at trial. We disagree. Rule 15(b) of the Federal Rules of Civil Procedure explicitly authorizes a party to amend his or her pleadings to conform to the evidence at any time-even after judgment-as long as the other party is not prejudiced. See note 3, supra. Friedman offers no evidence to show that it was prejudiced by the amendment, and we find none in the record
 
 
 [11]
 "In-and-out" trading consists of the sale of all or part of the customer's portfolio, with the money immediately expended on other investments, followed shortly by the sale of the newly acquired investments. Note, Churning by Securities Dealers, 80 Harv. L. Rev. 869, 876 (1967)
 
 
 [12]
 The plaintiff paid $16,406 in commissions for trades on his net deposit of $132,650 ($167,600 in deposits less $34,950 transferred to the trust account). During the period that the trades were authorized, Karlen paid commissions totaling approximately 3.5% of the money deposited. During the period following July 24, 1974, through December 31, 1974, however, the commissions charged were approximately twelve percent of the deposits. The commissions equaled about seven percent of the deposits for the period from January 1, 1975, until the account was closed
 
 
 [13]
 During the fifteen months Karlen's account was open, Margulies executed 138 trades. From the opening of the account through July 24, 1974, the defendant executed thirty-nine trades; for the period following July 24, 1974, to the end of 1974, there were fifty-eight transactions; and for the period from January, 1975, through August, 1975, there were forty-one trades
 
 
 [14]
 Dr. Murra explicitly testified that Margulies was engaging in in-and-out trading without following any apparent pattern or plan. See supra, at 1203- 1204. He also stated that Margulies traded in contravention of the fundamental commodities trading principle that a trader should "let profits run and cut losses short." For example, his examination of the accounts showed that losing contracts for live cattle in Karlen's account were held on the average of 122 days, while gaining contracts were held an average of fourteen days. The average loss on live cattle was $20,000, and the average gain was $3,300. Furthermore, Dr. Murra stated that Margulies mishandled Karlen's account by frequently holding futures contracts into the month the options were to be exercised, which-according to plaintiffs' expert-is uncommon among experienced traders because as the actual trade date approaches, the possibility rises of manipulation by traders holding a relatively small number of contracts. Indeed, Dr. Murra testified that several contracts were not traded until the very last day of the option month
 
 
 [15]
 Dr. Murra testified that when a trader is on opposite or both sides of the same contract, he or she has entered into contracts to buy and to sell the same commodity in the same month. Consequently, he stated that the trader necessarily will lose money because he or she will break even on the two transactions, while paying the commission on both trades. Friedman did not dispute this explanation. Dr. Murra testified that on at least five monthly closing statements, the Karlen account and trust account were on opposite sides of the same contract. In addition, he stated that there were at least four instances within the Karlen account where the plaintiff was on opposite sides of the same contract