James W. WILKINSON

v.

ROSENTHAL & CO., and Gregory F. Deutsch.

Civ. A. No. 87–0068.

United States District Court, E.D. Pennsylvania.

April 11, 1989.

Arnold Levin, Philadelphia, Pa., for plaintiff.

---

W. Scott Porterfield, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

HUYETT, Judge.

Plaintiff James W. Wilkinson is a disgruntled commodities investor who claims that defendant Gregory F. Deutsch ("Deutsch"), plaintiff's broker, churned and excessively traded his commodities account with defendant Rosenthal & Co. ("Rosenthal"). Plaintiff invested almost $78,000 in the account over a three month period. By the end of the period substantially all plaintiff's equity in the account was lost, and plaintiff owed Rosenthal an additional $18,000 plus interest.

Defendants move to exclude the testimony of plaintiff's expert witness, Jeffrey Jaffe, Ph.D., and to exclude portions of his report. The report concludes, *inter alia,* that the commodities account was an excessively risky investment given plaintiff's financial position, that the account was excessively traded, and that two types of statements furnished by Rosenthal to plaintiff "presented information that can easily be misinterpreted." Report of Jeffrey F. Jaffe, Court Exhibit 1, at 3, 6, 8, 10 [hereinafter, CX 1].

Defendants attack Dr. Jaffe and his report on several fronts. First, they argue that Jaffe's lack of experience and knowledge about commodities and commodities regulation renders his testimony and report entirely inadmissible under Fed.R.Evid. 702. Second, defendants claim that the conclusions of his report are based on "novel" theories of commodities trading and churning and that when balanced against the possibility of misleading the jury, should therefore be ruled inadmissible under Fed.R.Evid. 702 and 403.[1]

A hearing on defendants' motion in limine was held on March 23, 1989. Jaffe was questioned by the parties about the extent of his knowledge of commodities and the basis for the conclusions in his report. After reviewing the record, Jaffe's deposition and hearing testimony, I make the following findings of fact pursuant to Fed.R.Evid. 104(a):

1. Jeffrey F. Jaffe received a Bachelor of Arts from the University of Chicago in 1968, with a major in economics; a Master in Business Administration from the University of Chicago Graduate School of Business in 1971, with a major in finance; and a Philosophiae Doctor in Finance from the University of Chicago Graduate School of Business in 1972. Curriculum Vita of Jeffrey F. Jaffe, Court Exhibit 2 [hereinafter, CX 2].

2. Since 1971, Jaffe has taught finance and related subjects at the undergraduate and graduate levels. Since 1973, Jaffe has taught full-time at the Wharton School at the University of Pennsylvania. From 1973 to 1979, Jaffe was an Assistant Professor of Finance, and from 1979 to the present, an Associate Professor of Finance. He is a tenured member of the faculty at the Wharton School. CX 2.

3. During the pursuit of his post-graduate degrees, Jaffe took no courses concerning commodity futures trading. Deposition of Jaffe, at 6–9 [hereinafter Dep.].

4. Of the numerous courses he taught in the past, or teaches currently, only one involves commodity futures. Dep. at 63–64. That course, entitled "Speculative Markets," includes, among other subjects, introductory principles of what commodity futures contracts are, how they are traded, and basic trading strategies. The course does not involve the rules or regulations of the commodities industry. Dep. at 10–16, 64. During the hearing, Jaffe testified that this course does not deal with excessive trading of a securities account "directly." He further testified that the course deals with excessive trading "indirectly" by including material on the movement of

---

1. Defendants also contend that the report is based on assumptions provided to Dr. Jaffe by plaintiff's counsel which are contrary to the facts Wilkinson disclosed to Rosenthal when he opened the account. From this, defendants argue that the report is based on erroneous, or at least undisclosed facts. Because of my disposition of the other contentions, I do not reach this claim.

commodities prices over time and speculative strategies.

5. None of Jaffe's published scholarly works concern commodity futures, churning or broker reporting requirements. CX 2, Dep. at 7–15, 18–20.

6. In 1978, Jaffe conducted one study of agricultural commodity futures contract price cycles and returns. The study was not published, and Jaffe does not currently recall the specifics of the results. Dep. at 12–15.

7. In addition to his professorial duties, Jaffe regularly teaches seminars outside the Wharton School. He once taught a half-day seminar involving speculative strategies in the stock market, including stock index futures contracts. Dep. at 30–32.

8. Jaffe also serves as an editor or an *ad hoc* reviewer for numerous scholarly financial journals. Although he may have served as a reviewer of articles on commodities futures in the past, he has no present recollection of any involvement in any specific article involving commodities. Dep. 17–19.

9. Jaffe also engages in consulting on financial and investment matters. In that capacity, he has served as an expert witness for twenty six lawyers or law firms in matters involving the valuation of companies and real estate, risk and return in speculative markets, project finance, the impact of information on stock market prices, and churning and "unsuitability" standards in "the brokerage industry." CX 2 at 6.

10. However, this is the first matter in which Jaffe has been engaged that exclusively involves futures contracts. On only one or two other occasions has he been engaged to give an opinion on an entire investment portfolio which *may have* contained any futures contracts. However, Jaffe could not recall any portfolio which definitely contained commodity futures contracts. Dep. 38–58.

11. Jaffe admits that he has no knowledge of futures industry regulations, standards, practices, or laws concerning churning or suitability. Dep., *passim*. He has never read any caselaw, statutes, or regulations concerning commodities churning or suitability standards, except for one case furnished him by counsel for the plaintiff in connection with this action. Dep. at 93–96, 100–01, 143–50.

12. Jaffe has never worked in any capacity for any company engaged in the futures industry. Dep. at 94–96.

13. In preparing his report, Jaffe never spoke with plaintiff. Rather, he relied on information about plaintiff's financial position, investment objectives, and facts surrounding the opening of the account furnished to him by plaintiff's counsel. This information provides the basis for Jaffe's conclusion that the account was subject to "excessive and inappropriate risk" for plaintiff. CX 1, at 5–6; Dep., at 100.

14. Certain critical pieces of this information given to Jaffe are factually inaccurate. For example, the report states that Wilkinson planned to invest a total of $5,000 in the Rosenthal account. CX 1 at 2. In fact, it has been established that Wilkinson invested $10,000 when the account was opened.

15. Other financial and investment experience about Wilkinson provided to Jaffe is contrary to the information Wilkinson provided Rosenthal on the forms he completed when he opened the account.[2]

16. At the hearing, Jaffe testified that the methods he used in reaching the conclusions in his report concerning excessive trading did not come from the one commodities case he was provided by plaintiff's counsel. Further, he stated that any use of the methods he used to reach his conclusions were adapted from churning cases involving exclusively common stock portfolios.

17. Jaffe further testified that his techniques are good indicators of whether a

---

2. The agreements plaintiff executed were made part of the record in support of defendants' motion for summary judgment. The fact that plaintiff voluntarily executed these documents is not contested.

commodities account was excessively traded. Further, Jaffe testified his techniques represent the "fairest approach" to providing a "figure reflective of trading" in the account.

18. Aside from Jaffe's testimony concerning the validity of his methods, plaintiff provides no commodities caselaw which approve of computations similar to Jaffe's methods. Plaintiff also provides no scholarly works, papers, articles, treatises, or evidence which otherwise support, confirm, adopt or make any reference to the use of techniques similar to those in the report.

*Discussion*

Federal Rule of Evidence 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702.

▮▮▮▮bounds of admissible expert evidence are first defined by the claims in dispute. "Churning" is "the excessive trading of an account by a broker with control of the account for purposes of generating commissions, without regard to the investment or trading objectives of the customer." *In re Lincolnwood Commodities, Inc.*, [1982–84 Transfer Binder] Comm.Fut. L.Rep. (CCH) ¶ 21,986 at 28,246 (CFTC Jan. 31, 1984). Thus, the elements of the claim are 1) excessive trading 2) by a broker with control of the account 3) without regard to the investment objectives of the customer. *See Bowley v. Stotler & Co.*, 751 F.2d 641, 644 (3rd Cir.1985); *Chin v. Eastern Capital Corp.*, [1986–87 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 23,785 at 34,058 (CFTC 1987); *cf. Shad v. Dean Witter Reynolds, Inc.*, 799 F.2d 525, 529 (9th Cir. 1986) (churning claim under section 10(b) of the Securities exchange Act of 1934, 15 U.S.C. § 78j(b) (1982) has same three ele-

ments); *Costello v. Oppenheimer & Co., Inc.*, 711 F.2d 1361, 1367 (7th Cir.1983) (to establish churning claim under securities laws, plaintiff must show broker control and excessive trading), *accord Karlen v. Ray E. Friedman & Co. Commodities*, 688 F.2d 1193, 1203 (8th Cir.1982).

▮▮▮ Under Rule 402, expert testimony in a churning case is relevant. *Shad v. Dean Witter Reynolds, Inc.*, 799 F.2d 525, 529–30 (9th Cir.1986); *Chin*, [1986–87 Transfer Binder] Comm.Fut.L.Rep. (CCH) at 34,058. Expert testimony may be helpful to the jury under Rule 702 on each of the three elements of the claim. *Shad*, 799 F.2d at 530.

▮▮▮ Defendants first argue that Jaffe is not qualified as an expert for purposes of this case. Jaffe has an MBA and a Ph.D. from the University of Chicago School of Business in Finance. He is an associate professor of finance at Wharton. His expertise is in the area of finance related to the stock and bond markets; he has little, if any, work experience or academic history in the field of commodities. He did some minimal research in the area of financial futures, and was an editor or reviewer of several scholarly publications. Plaintiff claims that through his work for the publications, Jaffe has been exposed to commodities scholarship. Plaintiff also claims that although Jaffe has no knowledge of commodities regulatory authorities, he is still an expert in the field because he has taught one course at Wharton in Speculative Markets, which includes some material on commodities futures.

In this circuit, the standard for admitting expert testimony is "at a minimum, a proffered expert witness on [a subject] must possess skill or knowledge greater than the average layman in determining [the subject]." *Aloe Coal Co. v. Clark Equipment Co.*, 816 F.2d 110, 114 (3rd Cir.1987). According to the statements of plaintiff's counsel at the hearing, Jaffe is offered to testify as to whether plaintiff's account was excessively traded.[3]

---

**3.** Jaffe was originally to testify on three subjects: 1. the "suitability" of commodities invest-

ments for people with little financial net worth and income such as Wilkinson; 2. that the ac-

Certainly, Jaffe possesses more than a layman's knowledge of the "introductory" principles he teaches in the Speculative Markets course. Knowledge of basic principles, however, does not qualify him as an expert in determining whether a commodity futures account was excessively traded. A basic understanding of a subject does not necessarily imply qualification as an expert on the precise issue for jury determination. *See, e.g., Aloe Coal Co.*, 816 F.2d at 114 (sales representative familiar with equipment not qualified as expert to testify about the cause of equipment fire); *Higginbotham v. Volkswagenwerk Aktiengesellschaft*, 551 F.Supp. 977, 982,–83 (M.D.Pa.1982) (police officer with "minimal training in preliminary aspects" of accident reconstruction not qualified to testify as expert on movement of body inside vehicle), *aff'd*, 720 F.2d 669 (3rd Cir.1983). Consequently, if Jaffe is offered to testify about the basic principles of commodities investing, I would find he is qualified by reason of his academic credentials and teaching experience.

Jaffe, however, is offered to opine that the account was excessively traded. During the hearing, Jaffe testified that he has been previously engaged as an expert witness in a number of excessive trading cases involving investment portfolios comprised exclusively or primarily of securities that were not commodity futures. In fact, this is Jaffe's first case exclusively involving commodity futures contracts. Although he claims that he has reviewed articles concerning commodity futures, he cannot remember the substance of any specific article. Jaffe's teaching experience, by his own admission, does not "directly" involve what constitutes excessive trading.

Further, I found his explanation of the course's "indirect" coverage of excessive trading to be vague and generally unhelpful. Because a course includes material on trading strategy does not, without explanation, facially relate that material to the subject of excessive trading in a given ac-

count. Also, as discussed below, Jaffe's report erroneously analogizes commodity future accounts to stock and bond securities accounts. This error belies a misunderstanding of the fundamental differences between the two types of investments. These differences are critical to determining whether the account was excessively traded.

At bottom, Jaffe has no experience, skill, knowledge, or education in commodity futures contracts apart from the basic principles he teaches in the Speculative Markets course. Accordingly, Jaffe will be permitted to testify concerning basic principles of commodities investing. As evidenced by the errors in his report discussed below, Jaffe does not demonstrate sufficient knowledge of what constitutes excessive trading in a commodities account to be qualified as an expert on the subject. He will, therefore, not be permitted to testify on what constitutes excessive trading of a commodity futures account.

I turn to the conclusion that the account was excessively traded contained in Jaffe's report. Defendant's argue that the methods used by Jaffe in reaching his conclusion are not found in any commodity futures trading case, and that Jaffe's methods for reaching his conclusion is "novel scientific evidence" which should not be admitted under Rules 702 and 403.

In his report, Jaffe relied on information supplied to him by plaintiff's counsel as the basis for his opinion that the account was an "unsuitable" investment for plaintiff. Clearly, parts of this information are directly contrary to the information supplied to Rosenthal by plaintiff when he opened the account. Other data, such as the amount plaintiff planned to invest, are contrary to the facts established by the documentary evidence concerning the account. Of course, hearsay information supplied by plaintiff's counsel may be a source of information supplied to an expert. Fed.R.Evid. 703 advisory committee's note. However,

count was excessively traded; and 3. that the account statements and confirmation slips were not intelligible to an unsophisticated person like Wilkinson. However, other pre-trial rulings

have obviated the need for testimony regarding the account statements, and plaintiff agreed that the subject of Jaffe's testimony at trial would be limited to the excessive trading issue.

information which is contrary to the established facts of the case cannot be the type of information "reasonably relied on" to reach a sound opinion by experts in any field.[4]

Further, the notion that a jury should be allowed to rely on expert opinion based on erroneous information is incorrect. The purpose of allowing expert testimony is to assist the jury in understanding the facts of a complicated matter. "When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time." Fed.R.Evid. 702 advisory committee's note. An opinion based on false assumptions is unhelpful in aiding the jury in its search for the truth, and is likely to mislead and confuse.

The heart of defendants' attack is addressed to Jaffe's use of ratios and methods of comparison unknown to the commodity futures industry to reach the conclusions in the section of the report entitled "Trading Activity." During the hearing, Jaffe admitted that his techniques were not based on any commodity churning case, but claimed that his analysis was the "fairest approach" to determining the level of trading activity in the account.

There is no set formula determinative of excessive trading. *Chin*, [1986–87 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 23,785, at 34,058; *Fields v. Cayman Assoc. Ltd.*, [1984–86 Transfer Binder] Comm. Fut.L.Rep. (CCH) ¶ 22,688 at 30,928 (CFTC Jan. 2, 1985); *Meridian Brick Co. of Maryland, Inc. v. Murlas Commodities, Inc.*, [1982–84 Transfer Binder] Comm.Fut.L. Rep. (CCH) ¶ 22,042 at 28,662 (CFTC March 8, 1984). The Third Circuit expressly endorsed an approach to "objective indicia of excessive trading" in *Bowley v. Stotler & Co.*, 751 F.2d 641, 649–50. The court held that a jury charge in a commodities trading case should emphasize objective indicia of trading activity in an account such as commission-to-equity ratios, in view of the entire activity in the account, the number of day trades, the existence of significant ov-

ernight trading, and short term duration trades. *Id.; see also Chin, supra,* at 34,058 n. 2 (factors relevant to the issue of excessive trading include "(1) high commission-to-equity ratios; (2) high percentage of day trades; (3) a broker's departure from a previously agreed upon trading strategy; (4) trading in an account while it is under-margined; and (5) in-and-out trading").

Jaffe's analysis, as detailed below, is a variation on the commission-to-equity ratios approved of in other commodity cases. However, because plaintiff offers no case-law or scholarly support for the reliability of Jaffe's analysis, I must view the evidence as "novel scientific evidence" under Rule 702.

> Rule 702 requires that a district court ruling upon the admission of (novel) scientific evidence, i.e., evidence whose scientific fundamentals are not suitable candidates for judicial notice, conduct a preliminary inquiry focusing on (1) the soundness and reliability of the process or technique used in generating the evidence, (2) the possibility that admitting the evidence would overwhelm, confuse, or mislead the jury, and (3) the proffered connection between the scientific research or test result to be presented, and particular disputed factual issues in the case.

*United States v. Downing*, 753 F.2d 1224, 1237 (3rd Cir.1985). Further, *Downing, id.* at 1238–39, suggests that a district court should look to factors such as "[t]he expert's qualifications and stature, the use which has been made of the new technique, the potential rate of error, the existence of specialized literature, and the novelty of the new invention...." 3 J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 702[03] at 702–41 to –42 (footnotes omitted).

The Trading Activity section of the report analyzes two groups of statistics, the holding period of futures contracts in the account and commissions charged to the account. I begin with Jaffe's analysis of

---

**4.** Further, it is doubtful whether an opinion based on erroneous factual assumptions is admissible under Rules 402 and 401. An expert's opinion based on facts different from those established cannot "make the existence of any fact that is of consequence ... more probable or less probable than it would be without the evidence." Fed.R.Evid. 401.

the holding period of contracts in the account.

Jaffe computed the average holding period of the contracts in the account to be 26.22 days. According to Jaffe, there were 126 different contracts in the account at various times over the three month period it was open, excluding some "spread" contracts. Using a cut-off period of ten days, which Jaffe testified he arbitrarily selected, the ratio of contracts in the account held less than ten days, 53, to the total number in the account, 126, was 0.42. Jaffe then compares these figures to the average holding period for *New York Stock Exchange stocks*, and concludes "the actual average holding period of 26.22 days, with even more rapid turnover for a large part of the account, is so far from the trading behavior of an appropriately managed account that it implies excessive trading." CX 1, at 8.

Clearly, while Jaffe may be well respected in the field of finance and securities trading, he has no professional stature in the field of commodity futures. His analysis of holding period is entirely "novel" in that he testified that his selection of the ten day cut-off was arbitrary and unique to his analysis of the facts in the instant case.

Opinions which are based in large measure on a subjective analysis may have less probative value because it may be difficult to evaluate the skill of the expert in extrapolating a judgment from scientific data. "A technique unable to garner *any* support, or only minuscule support, within the scientific community, would be found unreliable by a court."

3 J. Weinstein & M. Berger, *supra*, at 702–42, *quoting United States v. Williams*, 583 F.2d 1194, 1198 (2d Cir. 1978), *cert. denied*, 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979).

Plaintiff provides only Jaffe's statement that his methods are the fairest approach as a basis for the choice of the ten day period and Jaffe provides no substantiation for his claim. I am unable to locate any case employing such a cut-off period.

Moreover, the dangers of erroneous or misleading results produced by this type of analysis of commodity futures is well recognized. The Commodities Futures Trading Commission discussed the precise problem.

There are "fundamental differences" between securities and futures contracts "that need to be taken into account when evaluating proof [of churning]." These differences make the "turnover rate," as applied in securities churning cases, inherently inappropriate for determining whether excessive trading has been established in futures churning cases. The "length of holding period," illustrated as an average by the turnover rate in securities cases, is not particularly relevant to a claim of commodities futures churning. [C]ommodity futures contracts are short-term instruments "and have a faster inherent turnover because of the relatively short expiration of futures contracts." Because of this, and the volatility of commodity prices generally, the length of time that a futures contract is held is not particularly revealing in determining whether a commodities account has been traded excessively.

*Lincolnwood Commodities, supra,* at 28,-247, *quoting, Smith v. Siegel Trading Co.,* [1982–84 Transfer Binder] Comm.Fut.L. Rep. (CCH) ¶ 21,105 at 24,453 n. 4 (C..F.T. C. Sept. 3, 1980).

I conclude, therefore, that plaintiff has failed to demonstrate the reliability of such analysis in determining the level of trading activity in the account.

Jaffe also analyzed commissions in the account. According to him, the total commissions charged to the account were $12,-250. This figure is then compared to two figures, the "average market value of the account" of $16,549 and the "average investment in the account" of $55,459. According to the report, these figures were calculated[5] from the "Statement of Account–Open Trade" provided plaintiff by Rosenthal during the time the account was open. CX 2 at 5–6. The ratio of total commissions to average market value is

---

**5.** Precisely how these figures were computed is    not detailed in the report.

74%, and the ratio of total commissions to average investment in the account is 22%. Jaffe then multiplies these ratios by a factor of four[6] to develop annualized ratios. The annualized ratio of commissions to average market value is 296% and the annualized ratio of commissions to average investment is 88%.

Again, it appears that Jaffe's ratios was never employed in any other commodities case. The Commission has approved use of a simple ratio of total commissions to total investment. *In re Auster*, [1980–82 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,095 at 24,409–12, *aff'd*, [1980–82 Transfer Binder] Comm.Fut.L.Rep. ¶ 21,274 (CFTC 1981), *aff'd sub. nom., Auster v. CFTC*, 687 F.2d 194 (9th Cir.1982). An acceptable and more complex commission-to-equity ratio was detailed in *Lincolnwood Commodities, supra*, at 28,248 & n. 82. An annualized commission-to-equity ratio is computed by determining first

> the average daily [equity] balance for each month by adding the ledger balances for each day of trading and dividing by the number of days of trading. The average daily balance [is] then divided ... [into] the total amount of commissions for that month to yield a commission/equity ratio.

Further, the Commission expressly disapproved the use of annualized ratios for accounts that are open for less than one year. *Id.*

The purpose of using commission-to-equity ratios is to provide an objective indicator of the amount of profits that must be earned in an account over a given period to pay the commission charges. *Id.; Bowley*, 751 F.2d at 649. Again, plaintiff provides no evidence that the ratios developed by Jaffe provide an objective indicator of the trading activity in the account apart from Jaffe's unsubstantiated assertion that his method is the "fairest approach." Certainly, plaintiff has not established that the ratios developed by Jaffe resemble those approved of in any commodities churning

case, much less the reliability of the ratios in providing an objective indicator of trading activity which a jury could reasonably be expected to be understand and be able to evaluate.

Further, I note that the use of the simple commission-to-investment ratio approved of in *Auster, supra*, reveals a drastically lower statistic than anything Jaffe computed. Using Jaffe's figure of $12,250 of total commissions, and dividing it by the total equity in the account of $78,000, provides a commission-to-equity ratio of 15.7%.[7] While there is no set formula of determining excessive trading as stated previously, the Commission has held that excessive trading was not present in an account with a similar ratio of less than 15%. *Chin, supra*, at 34,058.

Of course, the issue of whether plaintiff's account was excessively traded is one ultimately for the jury. However, the clear conflict in statistical results adduced under a method approved of by the Commission and the method used by Jaffe presents a situation in which the jury would be forced to evaluate the accuracy of the two methods. One method for determining the reliability of Jaffe's methods is for the jury to review the data on which Jaffe relied. *See Downing*, 753 F.2d at 1239. In part, the data is taken from the various account statements provided plaintiff by Rosenthal. However, plaintiff provides absolutely no evidence of what information Jaffe relied on to develop his conclusion that his was the "fairest approach." "The danger that scientific evidence will mislead the jury, might be greater, for example, where the jury is not presented with the data on which the expert relies, but must instead accept the expert's assertions as to the accuracy of his conclusions." *Id.*

In sum, the novelty of Jaffe's methods, the conflicting results adduced by the employment of methods approved of in the caselaw, and the unavailability of data to substantiate Jaffe's claim that his tech-

---

6. The account was open for approximately three months.

7. Also, I note that plaintiff has not provided an analysis of the account or the information necessary to conduct an analysis under the approach set forth in *Lincolnwood Commodities*.

niques yield the "fairest" analysis of trading activity in the account render the Trading Activity section of Jaffe's report inadmissible. Plaintiff has failed to establish that the ratios used by Jaffe are reliable indicators of trading activity in the account.

### CONCLUSIONS OF LAW

1. Plaintiff's expert, Jeffrey F. Jaffe, may be qualified as an expert at trial to testify on matters directly relating to the basic principles of commodities investing that he teaches in the course entitled "Speculative Markets." by reason of his education and teaching experience. Plaintiff's expert is not qualified to testify on matters relating to whether plaintiff's account was excessively traded.

2. The portion of Jaffe's report entitled "Trading Activity" is not admissible under Fed.R.Evid. 702 and 403. The methods used by Jaffe in reaching his conclusions in that section of the report constitute "novel scientific evidence." Plaintiffs fails to demonstrate that the methods used in the Trading Activity section are sufficiently reliable indicators of trading activity in the account to permit the jury to consider the evidence.