CLAYTON BROKERAGE CO. OF ST. LOUIS, INC., Petitioner,

v.

COMMODITY FUTURES TRADING COMMISSION and Webster S. Sturcken, Respondents.

No. 85–5177.

United States Court of Appeals,
Eleventh Circuit.

July 21, 1986.

Kenton E. Knickmeyer, St. Louis, Mo., for petitioner.

Charles D. Stodghill, Whitney Adams, Washington, D.C., for respondents.

J. Martin Obten, New York City, for other interested party.

Before HATCHETT and CLARK, Circuit Judges, and ALLGOOD *, Senior District Judge.

PER CURIAM:

Clayton Brokerage Co. of St. Louis, Inc. ("Clayton") petitions us to set aside a reparation award entered against it by an administrative law judge ("ALJ") with the Commodity Futures Trading Commission ("CFTC" or "Commission") in favor of Webster S. Sturcken. We have jurisdiction under 7 U.S.C. § 18(e).

## I. FACTS

Sturcken is a high-school educated, semiretired carpenter and home-building contractor. At the time relevant to this action, Edward B. Gotthelf was registered as an associated person ("AP") employed as a broker for Clayton, a registered futures commission merchant ("FCM"). Gotthelf was a principal contributor to Commodity Futures Forecast ("CFF"), an advisory newsletter distributed by Commodex, Inc., of which Gotthelf was a founder. There is no relationship between Commodex or CFF and Clayton.

Sturcken received a number of unsolicited copies of CFF, through which he was informed of the profits that could be made trading in commodity futures. He contacted CFF to request the name of a broker and was referred to Gotthelf. Sturcken had already learned from reading CFF that Gotthelf was the originator of a system for trading commodity futures.

Sturcken contacted Gotthelf and they had their first meeting on June 6, 1980, at Clayton's New York offices. Sturcken informed Gotthelf that he had no knowledge of the basics of commodity trading. He did, however, have some knowledge of business and investment matters. He had been a licensed real estate broker in New Jersey. He traded on the stock market during the years from 1968 to 1974. As a contractor, he built houses on speculation.

Gotthelf advised Sturcken that, in light of his ignorance about commodity futures, he should open a managed or discretionary account, which would authorize the broker to make trading decisions and to execute trades without first securing the customer's approval. With a discretionary account, Gotthelf stated that Sturcken could expect to receive a minimum 10% monthly return on his investment. He notified Sturcken that small losses could be expected in the account but that protective devices would be employed to minimize the losses and preserve the profits. He told Sturcken that after a six-month trading program Sturcken would be able to withdraw his entire initial investment and continue to trade on the profits he had earned during the initial period.

Sturcken informed Gotthelf that he wanted to invest $25,000 but was told that Clayton would only accept a managed account with a minimum balance of $50,000. Gotthelf advised Sturcken that $25,000 of the $50,000 would be placed in an interest bearing account and that only the other $25,000 would be used to trade commodity contracts. Gotthelf indicated that he would trade more conservatively at first by trading infrequently, limiting investments to a small group of commodities and avoiding volatile commodities.

Gotthelf informed Sturcken that if some world-wide disaster or government action should occur at the same time his commodity trading scheme was in a short down-turn and somehow half of Sturcken's trading funds were lost, all trading in the account would be halted, the account liquidated and a conference called to review all transactions. He assured Sturcken that this would never happen and related the details of several of his success stories. Gotthelf claimed that he had never lost a client's money.

After reading the risk disclosure statement required by 17 C.F.R. § 1.55, Sturcken decided to abandon the idea of trading

* Honorable Clarence W. Allgood, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

commodities and so informed Gotthelf. Gotthelf responded by telling Sturcken that no one pays any attention to the warning and that it is analogous to the warning on cigarette packages—it is given to comply with the law but means nothing. Sturcken signed the statement and other papers required to open an account, giving Gotthelf discretionary trading authority.

Soon after the account became active, Clayton decided not to authorize the discretionary handling of the account. On July 16, 1980, Clayton mailed notice of this decision and the cancelled trading authorization Sturcken had executed in favor of Gotthelf to Sturcken's New Jersey address. At this time, Sturcken was living at his Florida address, which had also been provided to Clayton, and he denies receiving the correspondence. Sturcken was informed of Clayton's decision by Gotthelf, who was incensed at the decision and told Sturcken to ignore it. He claimed that he had a contract with Clayton and would sue if Clayton interfered with his management of the account. He insisted that he would manage the account as before. While Gotthelf does not deny that this interchange took place, he claims that he received oral authorization from Sturcken before making each trade. Sturcken denies that he authorized any transactions.

Gotthelf acted as the account representative until the account was closed on February 11, 1981. Throughout the life of the account its balance fluctuated dramatically. The account experienced large gains as well as significant losses. After having fluctuated between net loss and net profit for several months, the account enjoyed an overall net profit for most of October, 1980. Sturcken could have terminated the account with a net gain at that time. Thereafter, however, the account showed varying degrees of net loss until it was closed in February, 1981.

Sturcken was informed of the status of his account through confirmation slips mailed within one day of each transaction and through month-end statements for the account. Sturcken received this informa-tion at both addresses and regularly reviewed the statements and slips. During October, 1980, Sturcken signed and returned an audit request confirming the accuracy of his September 30, 1980 statement.

Sturcken expressed concern about the losses and a desire to get out of the commodity futures market beginning as early as August, 1980. Gotthelf assured Sturcken that all was going according to plan and that if he were patient, he would get his money back. Sturcken claims that this pattern repeated itself many times. Sturcken would express alarm at the large losses the account was incurring and Gotthelf would reply that all was going well and that Sturcken should "hang in there" a little while longer. Sturcken claims that he accepted Gotthelf's explanations because of his respect for his expertise:

I felt that because of his credentials some sort of master was [working] according to plan and my part was just not to panic and all would be well.

Record Excerpts at 21 (letter from Sturcken to Clayton employee).

Gotthelf did not place the $25,000 in an interest bearing account as he had said he would until Sturcken discovered and protested his failure to do so. Neither did Gotthelf put into place any protective devices as he had informed Sturcken he would do. Despite continued requests from Sturcken that he do something to protect profits and minimize losses, Gotthelf took few, if any, steps towards such protection.

Losses continued and Sturcken finally closed the account on February 18, 1981. At the time of the closing, Clayton returned to Sturcken $9,749.45 of the $50,000 originally invested. Sturcken had previously withdrawn $10,000. Thus, Sturcken lost $30,250.55. After closing his account, Sturcken unsuccessfully sought an adjustment to his account from Clayton.

Sturcken instituted his reparation action with the Commission on July 28, 1981. The complaint named Clayton, Gotthelf and CFF as respondents and sought recovery

of the money Sturcken had lost. A hearing was held on January 31, 1983, and on May 10, 1983, the ALJ rendered an initial decision dismissing the claim against CFF but ordering Clayton and Gotthelf to pay reparations to Sturcken.

In his initial decision, the ALJ found that statements by Gotthelf to Sturcken fraudulently induced Sturcken to open an account with Clayton in violation of § 4b[1] of the Commodity Exchange Act ("CEA"). Although the ALJ found this conduct alone sufficient to establish liability, he found additional fraud in Gotthelf's continued management of the account after Clayton rejected it as a discretionary account, failure to use protective devices and continuing misrepresentations to Sturcken about the extent of the risk of trading. The ALJ further found that Sturcken had not ratified any conduct by Gotthelf that led to losses in his account and rejected Clayton's contention that Sturcken had made all trading decisions. Clayton was held responsible for Gotthelf's fraudulent conduct pursuant to § 2(a)(1)[2] of the CEA.

The ALJ assessed damages according to Sturcken's actual out-of-pocket losses in connection with the account. Thus, the order awarded Sturcken damages in the amount of $30,250.55, plus prejudgment interest at 16% calculated from February 18, 1981, the date the balance was returned, and $25 in filing fees. The interest rate was determined by reference to the prime rate.

Clayton and Gotthelf timely applied to the CFTC for review of the ALJ's initial decision. Without adopting the ALJ's order as its own or passing formally on the issues decided therein, the CFTC issued an order denying review on February 13, 1985. The CFTC found ample support in the record for the ALJ's conclusion that Sturcken was fraudulently induced to open an account with Clayton. The CFTC concluded that respondents had not disputed Sturcken's testimony indicating that Gotthelf had significantly understated and discounted the risks involved in commodity trading.[3] Clayton's petition to set aside the

---

**1.** Section 4b of the Commodity Exchange Act, 7 U.S.C. § 6b, provides, in relevant part:

> It shall be unlawful ... for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person ...
>
> (A) to cheat or defraud or attempt to cheat or defraud such other person;
>
> (B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;
>
> (C) willfully to deceive or attempt to deceive such other person by any means whatsoever....

**2.** Section 2(a)(1) of the Commodity Exchange Act, 7 U.S.C. § 4, provides:

> For the purpose of this chapter the act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

**3.** The CFTC found ample support in the record for the ALJ's factual findings:

> [Clayton and Gotthelf] never disputed [Sturcken's] testimony that Gotthelf: (1) promised him he would make money by opening an account managed by Gotthelf; (2) told him that in a few months of trading he would be able to withdraw his initial investment and operate purely from his profits; (3) told him that while a "world wide disaster or government action" conceivably could cause him to incur losses of up to one-half of his investment that situation would "never" happen; (4) told complainant that he had never lost any customer's money; and (5) assured him that the risk disclosure statement meant nothing and was provided only as a mere formality. Most importantly, respondents have never challenged complainant's assertion that he decided not to trade commodities once he read the risk disclosure statement and that he opened an account only after respondent Gotthelf discounted its meaning and importance....
>
> ... In light of respondent Gotthelf's continued assurances to complainant that Gotthelf's trading strategy would be successful, the record does not support the conclusion that complainant learned the true facts about the risks of futures trading....
>
> Record Excerpts at 10.

reparation award, which became final upon the CFTC's service of the order denying review, was filed with this court on February 28, 1985. Gotthelf has not joined in this petition.

## II. ISSUES

Clayton raises the following issues on appeal: (A) whether Gotthelf's misrepresentations about the risk involved in commodity futures trading proximately caused Sturcken's losses; (B) whether Gotthelf was acting within the scope of his employment with Clayton when he committed the acts of which Sturcken complains; (C) whether the ALJ's award of prejudgment interest at the prime rate was contractually barred or excessive.

We hold that the weight of evidence supports the ALJ's findings that Sturcken never learned of the risk of trading but continued trading in reliance on Gotthelf's misrepresentations, which therefore proximately caused Sturcken's losses. We further hold that, as Gotthelf was acting within the scope of his employment with Clayton when he made the misrepresentations, liability was properly imputed to Clayton under § 2(a) of the CEA. Finally, we refuse to set aside the requirement that Clayton pay prejudgment interest at the prime rate. We therefore deny Clayton's petition to set aside the award of reparations in favor of Sturcken.

## III. ANALYSIS

The ALJ found that Gotthelf had violated the CEA in several respects. *See supra* at 577. As liability under the CEA may be premised on fraudulent misrepresentation as to risk alone, *infra* at 578, and as we conclude that Clayton is liable for Gotthelf's misrepresentations, there is no need to consider Clayton's potential liability for other violations. We therefore address Clayton's arguments only as they relate to its liability for Gotthelf's continued and repeated misrepresentations about the risks of commodity futures trading.

4. See p. 577 n. 1, *supra,* for the text of this

### A. *Proximate Cause.*

■ Section 4b of the CEA, 7 U.S.C. § 6b,[4] prohibits fraudulent misrepresentation in connection with the making of commodity futures contracts on behalf of another person. *See Chipser v. Kohlmeyer & Co.,* 600 F.2d 1061 (5th Cir.1979); *Moody v. Bache & Co., Inc.,* 570 F.2d 523 (5th Cir.1978); *see generally* T. Russo, 1 *Regulation of the Commodity Futures and Options Markets,* §§ 12.32, 12.41 (1983). The risk inherent in trading is a material fact. *See Gordon v. Shearson Hayden Stone, Inc.,* [1980–1982 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 12,016 (CFTC April 10, 1980), *aff'd sub nom. Shearson Loeb Rhoades, Inc. v. CFTC,* 673 F.2d 1339 (9th Cir.1982). Misrepresentations about risk thus subject a broker to liability under § 4b. T. Russo, *supra;* Markham & Bergin, *Customer Rights Under the Commodity Exchange Act,* 37 Vand.L.Rev. 1299, 1309–16 (1984) (citing cases). Section 4b, however, incorporates the common law principle that one who misrepresents a material fact is liable only for those losses flowing from actions reasonably induced ("caused") by the misrepresentation. *Chipser,* 600 F.2d at 1068; *Moody,* 570 F.2d at 529.

Clayton first argues that, whatever the nature and effect of Gotthelf's initial misrepresentations, Sturcken must have learned about the risks of commodity futures trading as he watched his account balance fluctuate dramatically between the date he opened his account, in June, 1980, and the date he would last have been able to close his account without suffering any net loss, October 30, 1980. Hence, his continued trading and resultant losses thereafter were not "caused" by Gotthelf's misrepresentations but by Sturcken's knowing decision to incur the risks of continued trading. If Gotthelf's misrepresentations did not cause Sturcken's losses, there is no liability to impute to Clayton.

■ The CFTC and certain courts have held that a claimant who suffers losses

section.

after learning of the risk of trading cannot recover for earlier reliance upon misrepresentations about risk.[5] *See, e.g., J.E. Hoetger & Co. v. Ascencio,* 572 F.Supp. 814 (D.C.Mich.1983); *Stock v. Lincolnwood Commodities, Inc.,* [1977–1980 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,729 (CFTC Dec. 29, 1978); *see also Thompson v. Smith Barney, Harris Upham & Co., Inc.,* 709 F.2d 1413, 1418 (11th Cir.1983) (no liability under Rule 10b–5 for failure to disclose risk where customer knew or should have known of risk). It follows that until a customer *learns* of the risk of trading, his or her continued trading is premised on reliance upon the failure to disclose or misrepresentations about the risk involved, and the broker will be liable for losses resulting therefrom. *See Myron v. Hauser,* 673 F.2d 994, 1006 (8th Cir.1982); *Crook v. Shearson Loeb Rhoades, Inc.,* 591 F.Supp. 40 (N.D.Ind.1983); *cf., Karlen v. Ray E. Friedman & Co. Commodities,* 688 F.2d 1193,1198–1200 (8th Cir.1982) (customer who lacked sophistication and experience in commodity futures trading and who relied on expertise of broker could not knowingly ratify unauthorized trades).

■ In this case the ALJ did not specifically take note of the fact that Sturcken could have withdrawn from trading in October and assess the state of Sturcken's knowledge with respect to risk at that time. However, the ALJ did find that Sturcken never ratified Gotthelf's actions because "he was never in a position of having sufficient true knowledge of the situation and/or his *real* alternatives in order to make a decision." He also found that Gotthelf "continued actions without full disclosure," although Sturcken expressed dissatisfaction, and that Sturcken "accepted Gotthelf's assurances that everything was proceeding according to plan." The ALJ concluded that "Gotthelf fraudulently misinformed complainant as to the continued risk of success in the account."

The CEA sets forth the standard for judicial review of CFTC decisions. 7 U.S.C. § 9 provides that:

> The findings of the Commission as to the facts, if supported by the weight of evidence, shall ... be conclusive.

The court's task is "to review the record with the purpose of determining whether the finder of fact was justified, *i.e.,* acted reasonably, in concluding that the evidence, including the demeanor of the witnesses, the reasonable inferences drawn therefrom and other pertinent circumstances, supported [the] findings." *Myron,* 673 F.2d at 1005 n. 17.

Our review of the record reveals that the ALJ's findings, amounting to a finding that Sturcken never knowingly incurred the risk of commodity futures trading, were "justified" in the sense just set forth. Although Sturcken had some knowledge about business matters, he was inexperienced in commodity futures trading. He sought out Gotthelf because he had been led to believe that Gotthelf was a master of trading and had developed a scheme to ensure success. Significantly, the ALJ, who personally observed Sturcken's demeanor, found that "Sturcken was unknowledgeable in the field and does not possess a strong or commanding presence of authority. Rather his nature is more one of accommodation ... Gotthelf held Sturcken at his beck and call." The record supports the finding that Sturcken never learned of the risk of trading but continued trading in reliance on Gotthelf's misrepresentations.

Of particular significance is the fact that Gotthelf continued to misrepresent the risks of commodity futures trading throughout the life of the account. We are not asked to affirm a finding that a customer who entered into trading in reliance on misrepresentations about the risk involved and suffered losses over several months, without further being misled about the chance for ultimate profit, never

---

5. Because of the proximate cause requirement and the fact that Sturcken could have escaped without any loss several months after trading commenced, the ALJ erred as a matter of law in

stating that Gotthelf could be liable solely for fraudulently inducing Sturcken to open the account.

learned about the risks of trading. We are unwilling to conclude, as a matter of law, that Sturcken should have seen through Gotthelf's excuses and assurances to understand that the losses he had experienced reflected the true risk of commodity futures trading. We therefore reject Clayton's contention that Gotthelf's misrepresentations were not the proximate cause of Sturcken's losses.[6]

Clayton also argues that the risk disclosure statement signed by Sturcken, as required by 17 C.R.F. § 1.55, was sufficient to inform Sturcken of the risk of trading.[7] This suggestion is without merit. In the first place, presentation of the risk disclosure statement does not relieve a broker of any obligation under the CEA to disclose all material information about risk to customers. *See* 47 Fed.Reg. 52,723–725 (1982) (CFTC discussion of proposed amendment to § 1.55). The extent of disclosure necessary to provide full information about risk

will vary depending on the facts and circumstances of trading as well as on the nature of the relationship between the broker and the customer. *Id.*

Furthermore, this case involves affirmative misrepresentations as to risk. Sturcken was told by Gotthelf to ignore the risk disclosure statement. Oral representations may effectively nullify the warnings in the statement by discounting its general significance and its relevance to the customer's particular situation. *See Kelley v. Carr,* 442 F.Supp. 346, 353–354 (W.D.Mich.1977); *cf. Myron,* 673 F.2d at 1007 (that customer had signed agreement assuming risk did not exonerate broker for misrepresentation as to risk). Perusal of the statement reveals that it would not warn a customer to disbelieve the kind of misrepresentations involved in this case. It does not warn the customer to disbelieve representations that certain trading strategies can limit losses,

---

**6.** For the reasons just given, we also reject Clayton's contention that the losses following from the December, 1980, purchase of the June, 1981, T–Bond contract should fall on Sturcken because he initiated the trade. Were the facts as Clayton would have them, they might relieve Gotthelf of liability for unauthorized trading with regard to this transaction. However, Gotthelf and Clayton are liable because Sturcken's continued participating in trading was induced by misrepresentations about the risk of loss therefrom. By the time of the T–Bond transaction, it was too late for Sturcken to pull out without suffering a loss. Unless Sturcken learned of the risk of trading before purchasing the T–Bond contract and should have closed the account in mitigation, Gotthelf and Sturcken should be liable for all losses incurred by Sturcken. Sturcken did not learn of the risk of trading and made this trade, like all the others, at Gotthelf's express direction and in the hope his losses would be reduced. This loss was also caused by Sturcken's reliance on Gotthelf's misrepresentations.

**7.** The risk disclosure statement signed by Sturcken provides in relevant part:

The risk of loss in trading commodity futures contracts can be substantial. You should therefore carefully consider whether such trading is suitable for you in light of your financial condition. In considering whether to trade, you should be aware of the following:

(1) You may sustain a total loss of the margin funds you deposit with your broker to establish a position in the commodity fu-

tures market. In addition, if the market moves against your position, you may be called upon by your broker to deposit a substantial amount of additional margin funds, on short notice, in order to maintain your position. If you do not provide the required funds within the prescribed time, your position may be liquidated at a loss and you will be liable for any resulting deficit in your account.

(2) Under certain market conditions, you may find it difficult or impossible to liquidate a losing position. This can occur, for example, when the market makes a "limit move" against your position.

(3) Placing contingent orders, such as a "stop-loss" or "stop-limit" order, will not necessarily limit your losses to the intended amounts, since market conditions may make it impossible to execute such orders.

(4) A "spread" position may not be less risky than a simple "long" or "short" position.

(5) The high degree of leverage that is often obtainable in futures trading because of the small margin requirements can work against you as well as for you. The use of leverage can lead to large losses as well as gains.

This brief statement cannot, of course, disclose all the risks and other significant aspects of the commodity markets. You should therefore carefully study futures trading before you trade.

Record Excerpts at 48.

that the broker's scheme can overcome inherent market risks, or that certain commodities are less volatile. Those unfamiliar with the workings of markets are unlikely to understand that no broker can eliminate or diminish risk. The customer may be led to believe that the course of trading on which he or she embarks is not susceptible to the extreme risk that the statement warns "can" or "may" accompany trading. Further, the statement uses terms of art that require explanation, without which the significance of the warning to the particular customer may not be understood. Thus, it is not logically inconsistent to believe the warning on the risk disclosure statement while at the same time believing representations such as were made by Gotthelf.

■ The question is whether a customer who reads the risk disclosure statement can be said, as a matter of law, to understand the risk of trading so that reliance on misrepresentations by a broker is unreasonable. We cannot assume that a customer presented with a risk disclosure statement is thereby informed of the risk where, as here, the broker denies the need for any warning and continues to insist that trading is going according to his plan and will eventually result in profit.

### B. *Scope of Employment.*

■ Clayton's liability for Gotthelf's misrepresentations is based on § 2(a)(1) of the CEA, 7 U.S.C. § 4, which provides that "[t]he act, omission, or failure of any ... person acting for any ... corporation within the scope of his employment shall be deemed the act, omission, or failure of such ... corporation...." [8] This section "provides respondeat superior and general principal-agent standards for imposing liability on employers and principals for the acts of their employees or agents." H.R.Rep. No. 565 Part I, 97th Cong., 2d Sess. 105, *reprinted in* 1982 U.S. Code Cong. & Ad. News 3871, 3954. Liability based on respondeat superior has been imposed in reparation proceedings under the CEA. *See*

*generally* Markham & Meltzer, *Secondary Liability Under the Commodity Exchange Act—Respondeat Superior, Aiding and Abetting, Supervision, and Scienter,* 27 Emory L.J. 1115, 1131 (1978) (citing CFTC decisions).

Clayton argues that Gotthelf's liability may not be imputed to it under this section because he was not acting "within the scope of his employment" when he violated the duties imposed by 7 U.S.C. § 6b. Although not denying that it employed Gotthelf as an account representative during the relevant period, acquiesced in Gotthelf's handling the account on a nondiscretionary basis and serviced the account during the time it was open, Clayton argues that it should be relieved of liability for Gotthelf's fraudulent acts by virtue of its limitation of Gotthelf's authority to nondiscretionary trading. Clayton reasons that, because Gotthelf treated the account as if he had discretionary trading authority, any fraud he committed in the course of acting as Sturcken's account representative must have been outside the scope of his employment as a nondiscretionary account representative. Assuming Gotthelf's authority was effectively limited to nondiscretionary trading, his misrepresentations were nonetheless made within the scope of his employment, even if he treated the account as a discretionary one.

In order to determine whether Gotthelf acted within the scope of his employment with Clayton, it is important to examine exactly what Clayton did to limit Gotthelf's authority. The record reveals that Clayton revoked Gotthelf's trading authorization. This authorization notified Clayton that Gotthelf was authorized by Sturcken to act on his behalf to buy, sell or trade commodity contracts and that Sturcken ratified and confirmed all transactions between Gotthelf and Clayton for the account. Rejection of this authorization served only to prohibit Gotthelf from making trades not individually authorized by Sturcken. In effect, rejection of the authorization put

---

**8.** See p. 577 n. 2, *supra,* for the full text of this section.

Gotthelf in the same position, vis-a-vis Clayton, that he would have occupied had Sturcken never signed such an authorization.

It does not matter whether we call the account discretionary or nondiscretionary. As we have previously discussed, Sturcken's naivete about the commodity market and Gotthelf's overarching misrepresentations made Sturcken incapable of entering into trades knowledgeably. He was therefore legally incapable of authorizing or ratifying the transactions. *See Karlen,* 688 F.2d at 1198, 1201. This fixes Clayton's liability even if the account is nondiscretionary. *See id.* at 1198 n. 5. Accepting Clayton's denomination of the account as nondiscretionary, Gotthelf was making the misrepresentations as Clayton's agent and was acting within his scope of employment when he made the individual unauthorized trading transactions.

Clayton argues that Gotthelf breached duties owed only to discretionary account customers. It reasons from this premise that Gotthelf's liability must be based on an implicit finding that he acted outside the scope of his employment as a nondiscretionary broker. (Conversely, Clayton reasons, if Gotthelf acted within the scope of his employment, he should not be liable for the violations alleged by Sturcken.)

We have found no authority interpreting the CEA that makes the distinction suggested by Clayton. While the CFTC has stated that the duty to disclose information about risk will vary depending on the circumstances and the nature of the relationship between the broker and the customer, *see, e.g., Gordon, supra,* it has drawn no bright line between the duties owed customers of discretionary and nondiscretionary accounts. Rather it has adopted a more flexible approach that requires consideration of the degree of trust placed in the broker and the intelligence and personality of the customer. *Id.*

More importantly, we are not faced with mere breach of the duty to disclose information, but with affirmative misrepresentations about risk. These are separate and distinct violations of the CEA. *See* T. Russo, *supra* (discussing fiduciary breaches and fraud separately); Markham & Bergin, *supra* (same). Even were the CEA to incorporate different fiduciary duties depending on whether an account is discretionary or nondiscretionary, it in no way distinguishes liability for fraudulent misrepresentation by the type of account. Clayton has not pointed out and we have been unable to find any opinions holding or suggesting that the broker on a nondiscretionary account may misrepresent the risks of commodity futures trading without fear of · liability therefor.[9]

For these reasons, the case on which Clayton relies to persuade us that Gotthelf must have breached duties owed only to customers with discretionary accounts is inapposite. *Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 461 F.Supp. 951 (E.D.Mich.1978), involved a claim that a stockbroker had violated his fiduciary duty under the Securities Exchange Act by failing to disclose to the plaintiff-customer the consequences of the pattern of trading he was pursuing through a nondiscretionary account. The court held that a stockbroker

---

**9.** In *Karlen,* 688 F.2d at 1198–1201 (8th Cir. 1982), the Eighth Circuit held that a broker cannot successfully invoke the principle of ratification to defend against a claim of unauthorized trading where the plaintiff-customer has not assented to the trades "voluntarily and intelligently ... with full knowledge of the facts." *Id.* at 1201. Discussing the state of the plaintiffs' knowledge about commodity futures trading, the court pointed out that the plaintiff was an unsophisticated rancher who relied on the broker's expertise and that the broker had assured the plaintiff that the losses he was experiencing were all part of the trading plan. These factors, among others, led the court to conclude that the jury's verdict in favor of the plaintiffs on their unauthorized trading claim, and their rejection of the ratification defense, was supported by substantial evidence. Although it appears that the broker may have misrepresented the risks of trading much as did Gotthelf in this case, the case was submitted to the jury on an unauthorized trading theory. The appellate court was not presented with the question of the liability of a broker handling a nondiscretionary account for misrepresenting the risks of trading in commodity futures.

has no duty to inform a customer who is managing his own account that his trading strategy is particularly risky. The broker in *Leib* had done nothing to lead the customer to believe the strategy was not risky or to encourage him to engage in the unsuccessful course of trading in the first place. The court's discussion distinguished the kind of information that must be disclosed to a nondiscretionary account customer from that which must be disclosed to a customer for whom the broker is trading on a discretionary basis. The court did not hold or imply that a broker may misrepresent the risk of trading to a nondiscretionary account customer with impunity.

Clayton does not dispute that Gotthelf would be found to have acted within the scope of his employment were it not for Clayton's refusal to permit Gotthelf to treat Sturcken's account as discretionary. Clayton may not escape liability for the misrepresentations of its agent by limiting a customer who is incapable, as a matter of law, of authorizing trades to trading through an account that requires customer authorization. We hold that Gotthelf was acting within the scope of his employment with Clayton when he misrepresented the risk of trading to Sturcken.

### C. *Interest Award.*

Clayton challenges the ALJ's decision to award prejudgment interest and to set pre- and postjudgment interest at the prime rate (then 16%). Clayton failed to present these issues to the ALJ or the CFTC. Our role is to review the decision of the ALJ (or CFTC) and we will not usually decide issues first raised on appeal. However, the CFTC decision holding that the treasury bill rate, rather than the prime rate, should be used as the guideline for interest awards was not issued until after Clayton had filed its Application for Commission Review of the ALJ's Initial Decision. Because it would be unreasonable to require Clayton to have learned of the decision and raised the issue it creates before the CFTC prior to the CFTC's denial of review in this case, we will address the question whether Clayton should be required to pay only the treasury bill rate of interest.

In *Newman v. Bache Halsey Stuart Shields, Inc.*, 2 Comm.Fut.L.Rep. (CCH) ¶ 22,432 (CFTC Nov. 19, 1984), the CFTC decided to adopt the treasury bill rate as its interest guideline because it found that this rate more accurately reflects relevant market conditions. It had previously uniformly charged the prime rate. The CFTC expressly stated that the new rate would be applied in "all initial decisions awarding reparations after the date of this opinion." Although the initial decision in this case was issued long before *Newman* was handed down, Clayton argues that *Newman* should apply in this case because the ALJ's decision was not final until the CFTC denied review, after *Newman* was decided. In the alternative, it asks that we apply *Newman* retroactively. We reject these arguments.

■ When applying state statutory rates of interest, we defer to state law to determine how and whether changes in the statutory rate are to be applied to judgments already entered but not yet satisfied. In *Parsons & Whittemore Alabama Machinery & Services Corp. v. Yeargin Construction Co., Inc.*, 744 F.2d 1482 (11th Cir. 1984), we were asked to apply Alabama's amended rate statute as of the date of amendment to a judgment entered, but not satisfied, on the amendment date. The old rate would be applied up to that date. We declined to so apply the new rate because the Alabama Supreme Court had decided that the new rate was to be applied only to judgments entered after the effective date of the amendment.

■ Given that the CFTC may set its own guideline for interest rates, we must similarly defer to its determination as to when the new rate should go into effect. Clayton does not argue that the ALJ's award was inconsistent with the law at the time it was ordered or that the CFTC did not have the power to adopt the prime rate as its guideline for interest rates on reparations awards. We will not overturn the CFTC's decision to apply the treasury bill

rate only to reparations awarded in initial decisions after *Newman.*

That the initial decision may have been subject to review, and in that sense not final, when *Newman* was decided does not make any difference. The ALJ's award was as final as is any judgment entered by a district court. Just as a state may decide to apply a new rate only to future judgments, leaving those judgments entered but still subject to review to accrue interest at the old rate, the CFTC may decide to apply its new rate only to awards in future initial decisions.

## IV. CONCLUSION.

The ALJ's findings that Sturcken never learned of the risk of commodity futures trading and relied on Gotthelf's misrepresentations about risk are supported by the weight of the evidence. We therefore hold that Gotthelf's misrepresentations were the proximate caus, of Sturcken's losses. We also hold that a broker who misrepresents the risks of trading acts within the scope of employment as a nondiscretionary account broker, whether the customer's account is treated as a discretionary or nondiscretionary one. Finally, we decline to overturn the CFTC's decision to apply the treasury bill rate of interest only to those awards granted in initial decisions reached after *Newman v. Bache Halsey Stuart Shields, Inc.,* 2 Comm.Fut.L.Rep. (CCH) ¶ 22,432 (CFTC Nov. 19, 1984).

For the foregoing reasons, Clayton's petition to set aside the reparation award in favor of Sturcken is DENIED.