**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0454n.06
Filed: June 27, 2007

**06-4240**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| KHASHAYAR A. NASHERY and DAVID G. MOORE, | ) ) ) |  |
| Plaintiffs-Appellants, | ) ) |  |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| CARNEGIE TRADING GROUP, LTD., and JOHN C. GLASE, | ) ) ) |  |
| Defendants-Appellees. | ) ) |  |

Before:  RYAN, DAUGHTREY, and ROGERS, Circuit Judges.

**PER CURIAM.**  Plaintiffs Khashayar Nashery and David Moore filed this action for fraud under the Commodity Exchange Act, 7 U.S.C. §§ 1-25, common law fraud, and securities fraud.  Following a bench trial, the district court entered judgment in favor of the defendants, Carnegie Trading Group, Ltd., and John C. Glase.  The plaintiffs now appeal, contending that the district judge erroneously concluded that their signing of a risk disclosure form provided by the defendants barred the plaintiffs' commodities fraud claims and acted as a "safe harbor precluding liability based upon fraudulent misrepresentations made by an introducing broker."  Because we conclude that the plaintiffs have misconstrued

the reach of the district court's ruling, and because the evidence adduced at trial supports the more limited ruling actually made by the court, we affirm.

## **FACTUAL AND PROCEDURAL BACKGROUND**

Before the district court, the parties to this litigation stipulated that Man Financial, Inc., was a "futures commission merchant" under the Commodity Exchange Act because that corporation was:

> (A) . . . engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility; and
>
> (B) in or in connection with such solicitation or acceptance of orders, accept[ed] any money, securities, or property (or extend[ed] credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom.

7 U.S.C. § 1a(20). Furthermore, the parties agreed that Carnegie Trading Group was an "introducing broker" under the Act, and that Glase was an "associated person" with Carnegie.

The appellate record also indicates that Glase had been involved in the trading of commodities for 34 years by the time of trial in this litigation. By all accounts, Glase had proven to be quite successful in his chosen profession and had assisted Nashery's roommate, Roberto McCausland, in accumulating significant profits in the trading of United States treasury bonds. In the fall of 2003, Nashery contacted Glase and, although Nashery

purportedly had little or no knowledge about commodities trading, decided to invest with the defendant after being informed that bonds did not fluctuate rapidly and that Glase "had a 100 percent track record" in the bond market over the previous two years. Likewise, hearing of plaintiff Nashery's initial success in implementing Glase's investment strategies, Nashery's friend, plaintiff Moore, also contacted Glase about engaging in commodities trading.

Nashery holds both a bachelor's degree and a master's degree in mechanical engineering and has taught classes in business school. Nevertheless, he testified that he had no formal training in commodities or investments and had previously limited his financial portfolio to money market accounts and certificates of deposit. Similarly, Moore explained that his bachelor's degree in finance and accounting, his master's degree in business administration from Northwestern University, and his employment as senior vice-president of National City Bank's investment banking group did not necessarily translate into market savvy. In fact, he testified that his investment experience prior to meeting Glase had "always been in 401(k)s" and that he had no "experience at all in the commodities area" before his relationship with Glase and Carnegie.

Despite their lack of previous experience with commodities trading, both Nashery and Moore signed various risk disclosure documents as part of the application process. In doing so, they specifically admitted that they were familiar with "[t]he substantial risk of loss in futures and options trading, including the possibility of incurring a debit balance in [their]

account[s]," that they acknowledged and understood the risks delineated in the rules of the

Commodity Futures Trading Commission, and that they had considered detailed information

concerning commodities futures. By voluntarily signing Man Financial's statement, the

plaintiffs also acknowledged that they were informed that:

> Trading futures, futures options and other highly leveraged instruments ("Commodity Interests") carries a significant risk of substantial loss. You should only commit funds to trading Commodity Interests that represent "risk capital." Risk capital means funds that you do not need to meet your current or long-term financial requirements. Some industry observers have estimated that over 80% of those who speculate in Commodity Interests lose money. Given the leverage involved, these losses can occur and multiply quite rapidly, potentially exceeding the funds you have deposited in your account for margin or have earmarked as risk capital. *No one can guarantee that these risks can be limited, minimized or eliminated. In fact, you should immediately report to our Compliance Department at [telephone number and address], any statements to the contrary made to you by anyone associated with this firm.*

> In light of the foregoing, you should seriously consider whether your decision to trade Commodity Interests is appropriate in light of your particular circumstances. Please be advised that we do not and will not assume responsibility for monitoring your deposits, losses, or changes in your net worth. We will not refuse to accept your account if your decision to trade is made with full appreciation of the risk of loss. We do require, however, that you sign and return a copy of this Supplemental Risk Disclosure letter acknowledging that you are fully aware of the substantial risk of loss in trading and that you accept full responsibility for your decision to trade in Commodity Interests.

(Emphasis added.)

After signing these acknowledgments, the plaintiffs invested significant funds with

Glase. From December 2003 through February 2004, for example, Nashery deposited

- 4 -

$130,000 in his commodities account and, beginning in March 2004, Moore deposited $105,000 into his own account. Both plaintiffs intended, at least originally, to adhere to a treasury bond investment strategy that Glase had described to Moore as "boring," "commodities trading for grandmas," and "like hitting singles and doubles" rather than home runs. Although Glase claimed only that utilizing his investment strategy would prove to be less risky than futures trading, Nashery testified that he understood such comments to indicate that "the risks were virtually nonexistent." Moore testified that he also considered there to be "[e]ssentially . . . no risk," that the investments would be "virtually risk free," and that "the essence of the risk seemed to be the entry cost into the trade."

Possibly because Glase's investment strategy initially proved successful, either by allowing the plaintiffs to generate a profit on their investments or by eliminating potential losses through defensive techniques, Nashery and Moore eventually sought even greater control over their accounts and departed from the original strategy, thus increasing the risk to their investments. Unfortunately for the two of them, those deviations from the original investment programs resulted in substantial financial losses. For example, Nashery ultimately lost $121,292.42 of his $130,000 investment, and Moore lost $92,427.15 of his original $105,000.

Nashery insisted, however, that he relied completely upon Glase's advice when investing, and Moore claimed that Glase actually suggested all financial moves and Moore simply approved those suggestions. Glase, not surprisingly, offered a radically different

perspective on the events leading to the plaintiffs' financial woes. He testified that he never informed the plaintiffs that there was no risk to the bond option market. Additionally, he insisted that both Nashery and Moore did things without his recommendation and against his investment strategies, and that had the two plaintiffs "stayed with [his] spread strategy, they would have lost money, but it might have been only an eighth of what they ended up losing."

Eric Payne, another Carnegie Trading employee who shared a desk with Glase, corroborated Glase's recollection of the dealings with the plaintiffs. Payne explained that Nashery continued to make trades against Glase's recommendations even though the defendants cautioned Nashery as he began to lose money. Payne further testified that Glase never indicated to investors that the bond option market was "no-risk," never made any guarantees or promises to Nashery or to Moore about the profit potential of the accounts, and never informed Moore or any other individual that the risk warnings crafted by Carnegie Trading and Man Financial did not apply to the particular investments and strategies employed by Glase.

Eventually, the plaintiffs filed a five-count complaint against Carnegie Trading and Glase, alleging violations of the Commodity Exchange Act, the Securities Exchange Act, the Ohio Securities Act, and the Ohio common law of fraud. Prior to trial, however, the plaintiffs voluntarily dismissed the two securities law counts and focused instead on their allegations that the defendants made fraudulent misrepresentations in reference to commodity option

transactions.  At the close of proofs, the district court issued a lengthy oral ruling, concluding that the plaintiffs failed to prove by a preponderance of the evidence that Glase fraudulently misrepresented any information to Nashery and Moore.  The court further determined that, given the plaintiffs' sophisticated backgrounds, the risk disclosure forms signed by Nashery and Moore should have sufficiently alerted them to the dangers inherent in the activities in which they were engaging.  The court had acknowledged earlier during the trial that those forms did not create a "safe harbor."  Ultimately, the district court held that the plaintiffs could not reasonably have relied upon any statements made by Glase that they construed to mean that bond-option investments were risk-free, low-risk, or guaranteed to result in financial gains.  The district court therefore entered judgment in favor of the defendants.

## DISCUSSION

As in all actions tried by a district judge without a jury, the district court "shall find the facts specially and state separately its conclusions of law thereon."  Fed. R. Civ. P. 52(a). Those "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given [by the appellate court] to the opportunity of the trial court to judge of the credibility of the witnesses."  *Id.*  "A district court's finding is clearly erroneous 'when, although there may be some evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"  *United States v. Esteppe*, 483 F.3d 447, 450, (6th Cir. 2007) (quoting *United States v. Clay*, 346 F.3d 173, 178 (6th Cir. 2003)).

"The elements [of a claim of fraudulent misrepresentation under Section 4b of the Commodity Exchange Act] are derived from the common law action for fraud." *First Nat'l Monetary Corp. v. Weinberger*, 819 F.2d 1334, 1340 (6th Cir. 1987). Consequently, a plaintiff must prove that the defendant knowingly "misrepresented a material fact which was intended to induce reliance, that [the plaintiff] reasonably relied on the misrepresentation, and that the reliance was the proximate cause of [the plaintiff's] damages." *Id.* (citing *Horn v. Ray E. Friedman & Co.*, 776 F.2d 777, 780 (8th Cir. 1985)).

In this appeal, the plaintiffs contend that Glase misrepresented the reliability of his investment strategy and that Nashery and Moore relied to their detriment upon those misrepresentations in deciding to invest with the defendants. They further submit, relying upon *Clayton Brokerage Co. of St. Louis, Inc. v. Commodity Futures Trading Commission*, 794 F.2d 573 (11th Cir. 1986), that the district court erred in concluding that the signed risk disclosure forms excused, as a matter of law, the allegedly fraudulent statements.

Nashery and Moore are correct in their understanding that the mere "presentation of the risk disclosure statement does not relieve a broker of any obligation under the [Commodity Exchange Act] to disclose all material information about risk to customers." *Id.* at 580 (citation omitted). The plaintiffs misapprehend the reach of the district judge's ruling concerning the impact of the risk disclosure statements in this case, however. As even the *Clayton Brokerage* court recognized, "The extent of disclosure necessary to provide full

- 8 -

information about risk will vary depending on the facts and circumstances of trading as well as on the nature of the relationship between the broker and customer." *Id.*

In *Clayton Brokerage*, the Eleventh Circuit noted:

Perusal of the statement reveals that it would not warn a customer to disbelieve the kind of misrepresentations involved in this case. It does not warn the customer to disbelieve representations that certain trading strategies can limit losses, that the broker's scheme can overcome inherent market risks, or that certain commodities are less volatile. Those unfamiliar with the workings of markets are unlikely to understand that no broker can eliminate or diminish risk. The customer may be led to believe that the course of trading on which he or she embarks is not susceptible to the extreme risk that the statement warns "can" or "may" accompany trading.

* * * * *

We cannot assume that a customer presented with a risk disclosure statement is thereby informed of the risk where, as here, the broker denies the need for any warning and continues to insist that trading is going according to his plan and will eventually result in profit.

*Id.* at 580-81.

By contrast, the risk disclosure statements signed by Nashery and Moore specifically warned that over 80 percent of individuals who speculate in commodity interests lose money and that "[n]o one can guarantee that these risks can be limited, minimized or eliminated." Moreover, those statements explicitly cautioned that if anyone associated with Man Financial indicated that the risks of any such investment strategy could, in fact, be

limited or minimized, the incident should immediately be reported to the company's compliance department.

Additionally, contrary to the plaintiffs' contentions on appeal, the district judge did not rely solely upon the existence of the risk disclosure statements in reaching his decision. Rather, he merely factored the existence of those forms into the mix of considerations that led to the ultimate decision. Clearly, the judge also evaluated the plaintiffs' "sophistication as human beings" and the lack of credible evidence that Glase actually made any material misrepresentations whatsoever. Indeed, even the plaintiffs themselves conceded that they were informed of potential risks, but were led to believe that any such warning amounted to "general boilerplate language" and had no particular relevance to their specific situations. However, other witnesses, including persons who made like investments, testified that Glase never indicated that the warnings in the documents did not apply to their activities or that the trades envisioned were no-risk trades.

Furthermore, although Glase did represent to Nashery and Moore that the strategy that he had developed had been successful over a two-year period, the plaintiffs have adduced no evidence that such a statement was false or in any way misleading. Indeed, plaintiff Moore admits that he was enticed into investing with Glase precisely because he had witnessed the successful manner in which the strategy had been implemented with Nashery's capital and how his own potential losses had later been minimized by following the strategy. Additionally, Moore conceded both that the substantial losses that the

plaintiffs suffered were due, in large part, to their decision, although allegedly on Glase's advice, to depart from the safer strategy that Glase originally laid out for them and that the plaintiffs were aware that "there would be a substantial risk" involved in departing from the original strategy.

In short, the plaintiffs contend that their losses of significant monetary amounts were due solely to their placement of trust in defendant Glase and to the fact that Glase had intentionally misrepresented to them that it was impossible to lose money by following the strategy he had developed. Other than the self-interested plaintiffs, however, no other witness at trial could corroborate that Glase had ever made such an assurance that options trading would be risk-free. Moreover, Glase's strategy had proved successful in the past; indeed, it had been so lucrative for a friend of the plaintiffs that the two men were convinced that they themselves should seek to make similar investments. Both plaintiffs were educated, sophisticated businessmen. Furthermore, the plaintiffs read and signed statements explaining the inherent risks involved in these types of financial transactions and emphasizing that no investment counselor or trader could legitimately promise to limit, minimize, or eliminate those risks. In light of all these findings and considerations, the district court concluded that no improper misrepresentation of risk had been made to the plaintiffs by the defendants.

## CONCLUSION

The factual findings made by the district court were not clearly erroneous, and the court's legal conclusions were fully justified by relevant case law. We uphold the determination that the plaintiffs failed to carry their burden of establishing the elements of fraudulent misrepresentation under *First National Monetary Corp*, 819 F.2d at 1340, and we therefore AFFIRM the judgment of the district court in favor of the defendants.